W. F. PHELPS, JOHN F. McKINLEY and C. V. WHEAT, Appellants, v. W. H. SCOTT, J. D. ALEXANDER, J. S. LEA, LOYAL E. SCOTT, R. L. MATHEWS and BANK OF AURORA, No. 28578.—30 S. W. (2d) 71.

BANK OF AURORA v. W. H. SCOTT, JOHN F. McKINLEY, C. V. WHEAT, J. D. ALEXANDER, R. L. MATHEWS, J. S. LEA and W. F. PHELPS: W. F. PHELPS, Appellant; W. H. SCOTT, Respondent, No. 28579.

Division Two, July 3, 1930.

712

*J. L. McNatt* and *E. J. McNatt* for appellant.

714

*William B. Skinner* for respondents.

COOLEY, C.—The two above styled cases come here on separate appeals and are docketed as separate cases. The contending parties and the facts involved are the same. By agreement the cases were tried together as one case and the same bill of exceptions was filed in both cases. The same relief is sought in both. In fact, the two proceedings present substantially the same controversy, and were so treated in the trial court by the parties and by the court, although separate judgments were entered. In this situation we shall consider the cases together and dispose of them in one opinion.

The first case, No. 28578, was a suit in equity whereby plaintiffs Phelps, McKinley and Wheat sought to have a judgment previously obtained in the same court against them and others adjudged paid and to have it satisfied of record and for other equitable relief. Judgment went against plaintiffs and they appeal. The second case, No. 28579, involves the same judgment and an execution that had been issued thereunder. It was inaugurated by Phelps, one of the judgment debtors, by a pleading styled a motion to quash the execution, but which alleged the same facts and invoked the same relief as did the petition in the first named case, as will hereinafter more fully appear. The judgment was against Phelps who appeals. The second case is styled on our docket "Bank of Aurora, Respondent, v. W. H. Scott et al., Appellants," but, as indicated, the real appellant is Phelps and the real respondent is W. H. Scott. In fact, Phelps is the active appellant and Scott the active respondent in both cases and they will be referred to herein as appellant and respondent respectively.

Prior to April 15, 1922, Scott, Phelps, McKinley, Wheat, Alexander, Lea and Mathews were the directors of the Miners & Farmers Bank of Aurora, Missouri. Upon an examination of the bank just before that date it was found to be in such financial condition that

the examiners as a condition to its being allowed to continue business, required that $18,000 in cash be put into the bank. The directors being unwilling to put up the money, negotiations were had with the Bank of Aurora resulting in the latter bank purchasing the assets and assuming the liabilities of the Miners & Farmers Bank, but as a condition of the purchase and assumption of liabilities, the Bank of Aurora required a guaranty that assets amounting at face value to $165,273.63 taken over by it, would, within three years, realize that sum, which was the amount of liabilities of the Miners & Farmers Bank which had been assumed by the Bank of Aurora; and to meet this requirement the above named directors executed an obligation, called a bond, which in effect bound them to make good to the Bank of Aurora any deficit remaining at the end of three years in the amount collected out of said assets as compared with the face value named. There was such deficit and the Bank of Aurora sued upon the bond and, in September, 1925, recovered judgment against all seven of the signers for $39,400.71. That case was styled Bank of Aurora v. W. H. Scott et al.

Having obtained its judgment the Bank of Aurora demanded payment of Scott. Thus compelled, Scott satisfied the Bank of Aurora and had the judgment assigned of record to his son, Loyal E. Scott, in order to keep it alive, the bank at the same time assigning and turning over, either to Loyal E. Scott or to W. H. Scott, the uncollected remainder of the assets which had been turned over to it by the Miners & Farmers Bank, amounting, it is said to about $40,000 face value, and worth perhaps three or four thousand. The assignment was made January 20, 1926. Scott claimed in the present proceeding that his son Loyal had purchased and owned the judgment, but the court found otherwise, and as neither Loyal Scott nor W. H. Scott appealed, the fact is so accepted.

On December 8, 1926, Phelps, McKinley and Wheat instituted the suit numbered on our docket 28578, to have the above mentioned judgment decreed paid and satisfied of record. On December 24, 1926, an alias execution was issued on the aforesaid judgment in the name of the Bank of Aurora for the use of Loyal E. Scott, under which a levy was made December 28, 1926, upon certain property of Phelps's. On January 11, 1927, Phelps filed the motion or pleading which is the foundation of case numbered 28579 on our docket. It is styled in the caption thereof, "Motion to quash execution and pretended levy of execution," and referred to in his verification thereof as "the above and foregoing motion and petition." For brevity we will refer to it as a motion. Likewise, for convenience and brevity, we may designate the suit brought by the Bank of Aurora against the signers of the bond above mentioned as suit A; the suit of Phelps et al. against Scott et al., No.

28578, as suit B, and the proceeding instituted by Phelps to quash the execution, No. 28579, as suit C.

The petition in suit B and the motion in suit C are substantially identical. Each alleges the facts leading up to the execution of the bond, the relationship of the signers thereof to the Miners & Farmers Bank, the contract between the two banks, the execution of the bond to protect the Bank of Aurora from possible loss in assuming and paying the liabilities of the Miners & Farmers Bank if the assets of the latter turned over to the former proved insufficient to meet such liabilities, the suit and recovery of judgment on the bond against the signers thereof, payment of the judgment by W. H. Scott to the Bank of Aurora and the assignment of the judgment by said bank to Loyal E. Scott, who is alleged not to be the real owner, but to hold same "for the protection, use and benefit" of W. H. Scott, who, it is charged, furnished the money to pay the Bank of Aurora. It is alleged in both petition and motion that at the time of the assignment of the judgment the Bank of Aurora also assigned and surrendered to W. H. Scott the uncollected portion of the assets of the Miners & Farmers Bank which the latter had turned over to it under the contract between the two banks "to apply to the payment of the obligations of said Miners & Farmers Bank" and that W. H. Scott had not credited the value of said uncollected assets on the judgment and that in equity and good conscience he should be required to account therefor for the use and benefit of Phelps and all of the obligees on the bond.

It is further alleged in both petition and motion in substance and effect that Phelps's execution of the bond was procured by false and fraudulent representations of W. H. Scott concerning the value of the assets of the Miners & Farmers Bank. In addition to the allegations common to both petition and motion, the motion alleged the issuance and levy and threatened enforcement of the execution.

The petition prayed cancellation and satisfaction of record of the judgment, that any obligation "that may appear by reason of signing said bond be declared null and void and of no effect against this plaintiff and the other obligees in said bond and apparent debtors," that the Scotts be restrained from enforcing or attempting to enforce the judgment or causing execution thereon, and for all further and proper relief.

The prayer of the motion is equally inclusive. It asks not only that the execution and levy be quashed, but that the judgment be canceled and satisfied of record "and for naught held;" that W. H. Scott be required to account to "those defendants" (evidently meaning the judgment debtors) for the value of the notes and assets turned over to him by the Bank of Aurora, "and

for such other and further orders and judgments as may be proper in the premises." W. H. Scott answered by general denial, Loyal Scott by asserting his ownership of the judgment and general denial of other allegations.

As above stated, suits B and C were by agreement of all parties tried together as one case. In the offers and introduction of evidence and objections thereto no effort was made to differentiate between the cases or to designate to which case evidence offered or objections made were intended to apply. At the conclusion of the trial the court, however, rendered separate judgments. In suit B the judgment was a general finding and judgment for the defendants. In the judgment entered in suit C the court adjusted the equities between Phelps and Scott. It found that the assignment of the Bank of Aurora's judgment to Loyal E. Scott was made at the instance of W. H. Scott who had paid the consideration therefor, and that the assignment was made for the purpose of keeping the judgment alive and enforcible in Scott's behalf against the other judgment debtors, and that Loyal E. Scott had no interest therein; that all of the judgment debtors except Phelps and Scott were insolvent; that W. H. Scott, as owner and assignee of the judgment, was entitled to recover on execution against Phelps one-half of the judgment; that the alias execution had been issued at the instance of W. H. Scott in the name of the Bank of Aurora to the use of Loyal E. Scott, and levied upon Phelps's property for the full amount of the judgment; that with the assignment of the judgment there had been delivered to W. H. Scott "certain notes and commercial paper" by the Bank of Aurora which had been held by that bank "as collateral security to said judgment and which is now held by said W. H. Scott as trustee for the judgment debtors in the proportions of 9.8 per cent for John Alexander, 11.2 per cent for John F. McKinley, on account of their payments on the original debt before it went into the judgment rendered, and the remaining 79 per cent for himself the said W. H. Scott;" and thereupon adjudged and decreed that W. H. Scott was the owner and assignee of the judgment and that Loyal E. Scott had no interest therein, that the execution be credited with one-half of the amount thereof, so that the amount to be recovered thereon from Phelps be reduced one-half thereof; that upon payment of said half by Phelps, Phelps should be adjudged the owner of an undivided 39.5 per cent interest in the assets turned over by the Bank of Aurora to Scott, and that Scott upon such payment be and was declared to hold said assets as trustee for the use and benefit of himself, Phelps, Alexander and McKinley in the proportions of 39.5 per cent each for himself and Phelps, 9.8 per cent for Alexander and 11.2 per cent for McKinley; that the costs of issuing the execution "and all costs

on this motion to quash said execution" be taxed against W. H. Scott; and that the motion to quash be overruled.

I. Of the evidence but little need be said. Most of the essential facts found by the court are not seriously disputed. As forecast above, appellant asserted and respondent denied that W. H. Scott had furnished the money to pay the Bank of Aurora. That issue the court found for appellant and he cannot complain. Respondent's evidence (introduced over appellant's objections, of which anon) tended to show that the co-debtors of Phelps and Scott in the Bank of Aurora judgment were insolvent. Appellant offered no evidence on that question. The evidence showed without dispute that Alexander and McKinley had made payments on the obligation evidenced by the bond, prior to the suit thereon, in the proportions found by the court.

Appellant, conceding that the evidence in support of his contention that his execution of the bond was procured by fraudulent misrepresentations of W. H. Scott was meager, yet insists that it was sufficient to justify a finding in his favor on that issue and stamp the court's finding thereon erroneous. In this he is clearly mistaken. He had been a director and the vice-president of the Miners & Farmers Bank for a number of years prior to its closing and until about a year before that event, when he moved to St. Louis, had been fairly regular in his attendance at board meetings at which the paper and the affairs of the bank were considered. There was no claim made of concealment of liabilities or misrepresentation as to what the assets consisted of, or of any error or irregularity in the books. The alleged misrepresentations were relative to the collectibility of the notes held by the bank and were claimed to have been made at a meeting or conference of the directors on the evening of April 14 when the question of signing the bond was under consideration. Appellant's testimony in chief on that point is thus stated in the record:

"I remember distinctly that Mr. Scott said there would be no loss at all, it would be more a matter of form than anything else because we had enough assets to liquidate the bank and also leave us something for our stock, and others had also said that they didn't want to sign either, but they would agree to sign on those conditions only. Mr. Scott had been so persistent in it to sign that paper because he thought that was the best way the bank would liquidate fully, and so on this assurance we all agreed to sign. We were caused to sign because of Mr. Scott's declaration that the bank, in that way, was really in good condition."

On cross-examination he said:

"Mr. Scott did some of the talking in the meeting and when it came to liquidating the affairs, explained the condition and what had been done that far. Mr. Wheat did most of the explaining. As near as I can recollect it Mr. Scott . . . merely corroborated the story that Wheat had told, and he said he believed that was the best way out, that most of us could not put up money and he didn't see but what it would be all right to go ahead and do that, to put up this bond, because his belief was, his mind was, that the bank would liquidate . . . and leave a surplus on the stock. That was his belief, Mr. Scott did not say that there was anything in the bank in the way of security by which money could be raised and pay these obligations except what appeared on the books, or that the bank had any resources except what the books showed and what the bank examiner passed upon. He was expressing a belief of what would ultimately be gotten out of the securities. I don't know what opinion the bank examiners, Mr. Moody and Mr. Dye, had expressed about it. They told me the bank was in bad condition, but I didn't see any of those figures or papers. I didn't ask for any detail about what the examiners had stated. I thought that was sufficient if the examiners expressed that opinion and expressed that as an ultimatum, that was all of it."

Wheat was appellant's co-director and confidential friend, and on April 14, prior to the meeting of the directors referred to, had told appellant that the bank had been found in bad condition by the examiners, that there was not enough cash on hand and too much bad paper. The negotiations with the Bank of Aurora were then under way.

Without considering respondent's testimony, which contradicted that of appellant as to respondent's alleged insistence upon execution of the bond and assurance that the assets would realize enough to pay all liabilities, it is too plain for argument that even upon appellant's own testimony he did not make out a case of actionable fraudulent representations by Scott and reliance thereon by himself. Taking appellant's testimony as a whole it shows no more than that Scott was expressing an opinion or belief as to what might be realized from the bank's assets, somewhat more optimistic, perhaps, than the situation warranted (at least if judged by the subsequent washing out of matters), but purporting to be and known to appellant to be only an opinion and based on facts known or accessible to appellant. There was no evidence tending to show that Scott did not really believe what he professed to believe. Moreover, to weigh against Scott's opinion appellant had the knowledge that in the opinion of the examiners, who had thoroughly examined the bank's assets, it was in bad

shape and had too much bad paper. In the situation shown appellant cannot make out a case by his assertion that he "was caused to sign by Mr. Scott's declaration that the bank in that way was really in good condition." The court's finding of facts was well sustained by the evidence. The judgments entered work out substantial justice in the premises and should be sustained, if possible without violating established principles of law and rules of procedure.

II. Appellant contends that the transaction between respondent and the Bank of Aurora, whereby respondent satisfied the bank's claim, amounted in legal effect to payment and extinguishment of the judgment regardless of the intent of the parties, which intent was to keep the judgment and its lien alive for the benefit of respondent in enforcing contribution from his judgment co-debtors. That it paid and discharged the judgment so far as the Bank of Aurora is concerned may be conceded. Also it may be conceded that payment of a judgment against several, each of whom is primarily liable for the debt, satisfies and extinguishes the judgment, at law, rendering it *functus officio* as to all the judgment debtors regardless of intent of the parties, and that this result cannot be avoided by having the creditor assign the debt or judgment to the paying debtor. See Hull v. Sherwood, 59 Mo. 172; Note to Nelson v. Webster (Neb.), 68 L. R. A. 513, par. II, p. 514, et seq., where the rule is stated and many authorities from various jurisdictions cited. But that is not the situation here presented as we shall attempt to show.

The judgment debtors in suit A were all equally liable to the Bank of Aurora on the bond but none of them was primarily liable for the debt, which was primarily the obligation of the Miners & Farmers Bank. The bond and the contract between the banks whereby the Bank of Aurora took over the assets and assumed the liabilities of the Miners & Farmers Bank, while written on separate papers, were executed at the same time as one transaction and in order to effectuate a single purpose, each refers to the other and they must be considered together, as understood and intended by the parties. With respect to that debt those who signed the bond stood in the relation of co-sureties or guarantors—perhaps accurately, guarantors, —but since their mutual rights and remedies as among themselves would be the same whether they be considered technically sureties or guarantors, we may for convenience refer to them as co-sureties. We have here, therefore, in effect a proceeding wherein a surety who has paid to the creditor the whole debt seeks contribution from a co-surety, not a case where one of several jointly and primarily liable has so paid.

Furthermore, this proceeding is not to be considered as strictly an action at law. If it involved only an ordinary motion to quash an execution we might have a different question with which to deal. But since in his motion (so-called) as well as in his petition, appellant invoked equitable relief and alleged facts calling for such relief, presented all of the issues in both cases together as a single proceeding in equity, as hereinabove shown, we think that even though it be somewhat irregular, the whole matter should be treated here on appeal as it was by the action of the parties below—as a single proceeding in equity. [See Boland v. Ross, 120 Mo. 208, 215, 25 S. W. 524.] And it is a well settled principle in courts of equity that when they once acquire jurisdiction of the subject-matter they will retain it until full justice has been done between the parties. [McDaniel et al. v. Lee et al., 37 Mo. 204; Waddle v. Frazier, 245 Mo. 391, 151 S. W. 87; Boland v. Ross, supra, l. c. 216; Real Estate Sav. Inst. v. Collonious, 63 Mo. 290, 295.]

"It [a court of equity] will not content itself in this regard by any half-way measures; it will not declare that a party has been defrauded of his rights and then dismiss him with a bland permission to assert, at new cost and further delay, those rights in another forum." [Boland v. Ross, supra, l. c. 216, and see cases cited.]

While, as stated above, payment by one of several primarily liable extinguishes the original debt or judgment, it is otherwise when payment is made by one standing in the relation of surety or guarantor. It is generally held that in equity when one standing in such relation pays he is, at least as against the debtor primarily liable, subrogated to all the rights and remedies of the creditor, and this even without a formal assignment of the debt or judgment, if the intent was not to extinguish same but to keep it alive for the purpose of enforcing the rights of the paying surety. [1 Brandt on Suretyship (3 Ed.) secs. 333, 341, 342, 343, 349; Stearns on Suretyship (3 Ed.) sec. 249 et seq.; Bispham's Principles of Equity (10 Ed.) secs. 335, 336; Furnold v. Bank, 44 Mo. 336; Berthold, Admr., v. Berthold, 46 Mo. 557; Allen v. Dermott, 80 Mo. 56, 59; Ferguson's Admr. v. Carson's Admr., 86 Mo. 673, distinguishing Hull v. Sherwood, supra, and other cases holding that *at law* such payment extinguishes the judgment; Benne v. Schnecko, 100 Mo. 250, 257, 13 S. W. 82; Harper v. Rosenberg, 56 Mo. App. 388; Cauthorn v. Berry, 69 Mo. App. 404, where judgment was paid and assignment taken by surety; Thomas v. House Mut. B. & L. Assn. (Ill.), 90 N. E. 1081; O'Keefe v. Eclipse etc., Co. (W. Va.), 115 S. E. 579; and see extensive notes to Nelson v. Webster, supra, in 68 L. R. A. 513, Pars. IV-IX, where authorities are collected.]

"It has been uniformly declared and fully acted upon, in the courts of chancery in this country, that the claim for contribution among co-sureties, as well as the claim for indemnity on the part of the surety against the principal, is founded not upon contract, but upon a principle of natural justice and equity; the maxim adopted in regard to co-sureties being that equality is equity among persons standing in the same situation." [Furnold v. Bank, supra.]

We see no good reason why the same equitable rules applied in the protection and enforcement of a surety's right of subrogation as against the principal debtor should not apply in the protection and enforcement of his right to contribution from co-sureties. That it does so apply is fully recognized in Furnold v. Bank, supra, wherein a judgment had been obtained against three who were co-sureties, and plaintiff, who had purchased from one of the sureties land subject to the lien of the judgment, was compelled to pay the judgment to protect his land from levy and sale. It was held that while at law he would have no redress save action against his grantor, equity would subrogate him to the rights of his grantor and charge the lands bound by the lien of the judgment in the hands of the other sureties or their grantees who purchased with notice; that payment of the debt (judgment) did not discharge the lien as to those who were liable to contribution but operated in equity as an immediate assignment to plaintiff of all liens and securities held by the judgment creditor and that it was such creditor's duty to make the assignment. See also Berthold, Admr., v. Berthold, supra; Benne v. Schnecko, supra; Williams v. Riehl (Cal.), 59 Pac. 762; Wright v. Grover & Baker S. M. Co., to use of Smith, 82 Pa. St. 80, and cases cited; Lidderdale's Executors v. Ex. of Robinson, 12 Wheat. 594; Cuyler v. Ensworth (N. Y.), 6 Paige, 32, holding that sureties who had paid a judgment were entitled in equity to have the judgment kept alive in order to enforce their right of contribution against a co-surety and, as we understand the case, to proceed by execution under the judgment; Smith v. Rumsey, 33 Mich. 184, holding that a court of equity will preserve the security of the levy of an execution to the extent of the lawful claim for contribution as against a co-surety and enforce the right of subrogation; Neal v. Nash, 23 Ohio St. 483; 1 Brandt on Suretyship (3 Ed.) sec. 305, saying that Cuyler v. Ensworth, supra, announced the approved doctrine.

In Stearns on Suretyship (3 Ed.) sec. 249, page 443, it is said: "If the judgment of the creditor is against several co-sureties, the surety paying will be subrogated to the rights of the creditor upon the judgment against the co-sureties."

Appellant and respondent both cite McDaniel et al. v. Lee et al., supra. We think that case supports respondent's contention

and is authority for the course pursued by the trial court in this case. In the McDaniel case, Lee had obtained judgment against Tyre, Cummins and Bray. It seems that Cummins and Bray were co-sureties for the debt. Cummins had been compelled to pay it, and had taken an assignment of the judgment from Lee, which he was seeking to collect on execution. McDaniel, claiming to be the owner of the land levied on, sued to enjoin further proceedings on the judgment and execution, alleging that it had been fully paid to Lee. Cummins contended that as assignee he was entitled to collect the whole amount by the execution. A portion of the judgment had been allowed against the estate of a deceased surety and the court enjoined so much of the execution as had been thus allowed, and disallowed the injunction as to the balance. This court said that neither at common law nor under the statute could a security, by simply paying the debt after judgment without other proceedings, be substituted to the rights of the judgment creditor and have execution. But that observation evidently had reference to purely legal rights, because the court further said that it was unnecessary to consider what were Cummins's legal rights as assignee; that his co-defendants had sought relief in a court of equity which was competent to do complete justice in the premises, and held that it was the duty of the trial court to adjust all of the equities between the parties, to ''make the injunction perpetual as to all except that portion which ought to be paid by Bray, and to dissolve the temporary injunction as to that portion and order the sheriff to proceed to collect it.'' That is, in effect, precisely what the trial court did in the instant case.

III. Appellant objected to the evidence relative to the insolvency of his co-sureties, on the ground that that matter was not in issue. It is further suggested in his brief that the other sureties were not parties to the proceedings. It does not appear that they were served with notice of the motion in suit C. All were parties and served with process in suit B and seemingly consented to the hearing of suit C in connection with suit B. However, whether the co-sureties other than appellant and respondent may be considered parties to the proceeding or not, since the decree adjusting the equities was entered in suit C, still, in order to adjust the equities between appellant and respondent it was necessary for the court to ascertain whether or not there were other co-sureties who were financially able to contribute. If so, respondent would be entitled to recover from appellant only the latter's aliquot part measured by the number of solvent sureties. If there were no others solvent he would be entitled to recover from appellant half of the judgment as found and adjudged by the

court. Where one of several sureties equally bound has paid the whole debt, he should have the right to recover from solvent co-sureties a pro-rata amount of the sum paid, based upon the number of solvent sureties and excluding the insolvent ones. [Dodd v. Winn, 27 Mo. 501; Van Petten v. Richardson, 68 Mo. 379; 1 Brandt on Suretyship (3 Ed.) sec. 314, and cases cited in note.] And it seems that in an action for contribution the insolvent sureties need not be made parties to the proceedings. [1 Brandt on Suretyship (3 Ed.) sec. 318; Dodd v. Winn, supra; Van Petten v. Richardson, supra.] The court did not err in hearing the evidence complained of.

IV. It is also contended by appellant that the relief granted is not within the issues made by the pleadings, respondent having filed only a general denial and asked no equitable relief. If it depended upon respondent's pleading, appellant's contention would have to be sustained. But the judgment is responsive to the issues presented by appellant's own pleading in both cases. In his motion (so-called) in suit C, as well as by his petition in suit B, he invoked the equity jurisdiction of the court and presented facts and issues properly cognizable in a court of equity, and as above shown, tried out all the issues as though they had been presented in a single proceeding. Having voluntarily thus presented his cause he should not now be heard to complain that the proceeding was irregular or that respondent did not ask equitable relief, so long as the court's judgment did no more than determine the issues which appellant by his own pleadings presented. We think it did no more than that. The fact that the court did not give appellant all he asked, but found against him in part and decreed accordingly, cannot affect the question of jurisdiction to render the judgment that was rendered. In Waddle v. Frazier, supra, plaintiff sought partition of lands among himself and the defendants against whom suit was brought. One William Frazier, not originally a party, was permitted upon his own request to become a party defendant, and he set up an equitable claim to the entire title and also claimed to be in adverse possession. Cast on the trial and denied any interest in the land and judgment going for partition among the other parties, he appealed and in this court asserted the proposition that partition could not be maintained since the parties seeking it did not have actual or constructive possession, he himself having been in actual and adverse possession when suit was brought. The judgment was affirmed. The court said that the rule invoked by appellant Frazier did not apply when the adverse outside claimant "voluntarily comes into the partition suit as a party, sets up an equitable title to the land and prays an adjudication thereon and prays for such

other and further orders and decrees as to the court may seem proper;'' and further that when a court of equity has acquired jurisdiction of a cause for one purpose it will proceed to do complete justice between the parties and determine all matters in issue, even if this involves adjudicating matters of law.

For the reasons indicated we think the judgments in both these cases should be and they are affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.