Glenn L. BOLLING and Ila L. Bolling, Mae L. Hausmann, Fairhills Company, B & H Homes, Inc., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17912.

United States Court of Appeals
Eighth Circuit.

Feb. 28, 1966.

**4**

William H. Curtis, Kansas City, Mo., Roy C. Hormberg, Kansas City, Mo., for petitioners.

Crombie J. D. Garrett, Attorney, Tax Division, Department of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Dept. of Justice, Washington, D. C., Lee A. Jackson and Meyer Rothwacks, Attorneys, Tax

Division, Dept. of Justice, Washington, D. C., for respondent.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

Glenn L. Bolling and Mae L. Hausmann were engaged in the business of constructing and selling homes in the Kansas City area. They conducted their business through two accrual basis partnerships, Bolling-Hausmann Builders and Bolling-Hausmann Development Company, and two wholly owned accrual basis corporations, Fairhills Company and B & H Homes, Inc. At issue here are asserted deficiencies in federal income tax for the individual taxpayers for the calendar years 1959 and 1960, for Fairhills for its fiscal years ended March 31 in each of the years 1958–60, inclusive, and for B & H for its fiscal year ended June 30, 1961. The cases were consolidated for trial in the Tax Court and come to us as a unit.[1]

The Tax Court stated the issues as follows.:

"(1) Whether accrual basis home builders and sellers acting as loan guarantors for customers must include in income in the year of sale portions of sales proceeds pledged as loan security to the lender, which lender thereby granted loans to the sellers' customers in excess of the usual maximum amounts; and if so,

"(2) Whether petitioners are entitled to deductions for additions to bad debt reserves" under § 166 of the Internal Revenue Code of 1954.[2]

Judge Forrester, in an opinion not reviewed by the full court, answered the first question in the affirmative and the second in the negative and thus de-

---

[1.] Inasmuch as taxpayer Hausmann filed her returns with the District Director at Wichita, Kansas, her petition for review is here by stipulation as permitted by § 7482(b) (2) of the 1954 Code.

[2.] Section 166. Bad Debts
(a) General rule.—
(1) Wholly worthless debts.—There shall be allowed as a deduction any debt

which becomes worthless within the taxable year.
\* \* \* \* \*
(c) Reserve for bad debts.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

cided both issues against the taxpayers. T.C. Memo 1964–143.

There is no dispute as to the facts. The homes constructed and sold by the taxpayers were low or moderately priced dwellings. They were sold under contracts providing for a down payment as small as 5% of the sales price. This naturally entailed more than the usual risk for a lending agency. A plan, however, was evolved with Home Savings Association of Kansas City. Home's normal policy was to limit the amount of any home loan to a maximum of 80% of appraised value. By contracts with Builders, B & H and Fairhills, Home agreed to lend up to 95% of appraised value to customers of the taxpayers. The particular vendor-taxpayer agreed to pledge and assign to Home, as collateral, a share account of Home equal to the difference between 90% of Home's appraisal and the amount loaned.[3] To this extent the amount loaned was deposited by Home in the share account rather than paid to the vendor. The purchaser did not become indebted to the vendor. Each of these contracts also provided that (a) "The collateral shall earn a dividend at the current rate and shall be payable to the Seller at the regular dividend paying periods"; (b) the vendor's share "shall be in one account for the entire group of loans" for that vendor; (c) subject to stated conditions and limitations, the collateral would be released to the vendor as loan principal was reduced; and (d) in the event of a foreclosure, Home was authorized to make up any deficiency from the share account. The taxpayers did not contemplate full release of the collateral share accounts for some years.

It is thus apparent that these agreements served to reduce Home's exposure beyond the specified ceiling, that the full purchase price was not received by the seller at the time of the sale, and that, for each vendor, Home's collateral was pooled and subject to use in the event of any foreclosure and deficiency.

In line with these agreements, amounts were credited by Home to share accounts for Builders, Fairhills and B & H during the tax years in issue. This led to the tax issues now before us.

On the income issue Judge Forrester held that his decision was controlled by Key Homes, Inc., 30 T.C. 109 (1958), aff'd 271 F.2d 280 (6 Cir. 1959), and that the taxpayers "have failed to sustain their burden of proving that the instant factual context presents additional contingencies of a magnitude sufficient to alter the rule of Key Homes, Inc." On the deduction issue, the court, after expressing doubt as to whether Builders and Fairhills had complied with formal requirements for bad debt reserves, held that, in any event, "guarantor situations are not within the purview of the bad debt reserve provision". He adhered to Wilkins Pontiac, 34 T.C. 1065 (1960), despite its reversal, 298 F.2d 893 (9 Cir. 1961), but expressed "sympathy with the views of the Ninth Circuit" and described the situation as an "unfair" and "unhappy" one.

■ A. The includability issue. For a reporting entity on the accrual basis the standard as to includability of an income item "is the *right* to receive and not the actual receipt * * *. When the right to receive an amount becomes fixed, the right accrues". Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184–185, 54 S.Ct. 644, 645, 78 L.Ed. 1200 (1934). The Court in that case made it clear that predicted uncollectibility, no matter how certain, does not affect a creditor's right to receive payment and, consequently, its obligation to accrue and include in gross income. This principle is accepted by both sides here but the taxpayers assert that it does not have application to the present facts.

Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959), although it concerns automobile dealers rather than

3. For some sales by Fairhills the agreed difference was that between 80% of appraised value and the amount loaned, with certain allowances if the loan was for less than 90% of the appraised value.

home builders, is significant. *Hansen* resolved an existing conflict among lower court decisions (including one of our own, Glover v. Commissioner, 253 F.2d 735 (8 Cir. 1958)) as to the inclusion, for an accrual basis taxpayer, of amounts in automobile dealers' reserve accounts. The details of the several cases varied somewhat but, in general, the lender paid the dealer the face amount of a customer's note less a certain percentage which the lender credited to the dealer but withheld in a reserve account. The dealer indorsed the note with recourse or otherwise agreed to protect the lender against loss. The reserve was held as collateral to secure this obligation. Periodically, the lender released to the dealer any amount in the account which exceeded a stated percentage of outstanding loans. The dealers contended, as do the builders here, that the amounts so retained were subject to such contingent liabilities that it could not be known in the year of sale how much, if any, of the reserves would ever be received by them and that, therefore, they did not acquire a fixed right to receive the reserved amounts and these did not qualify as accrued income to them.

The Supreme Court held, pp. 464–466 of 360 U.S., 79 S.Ct. 1270, that (a) the fact the dealer could not presently compel the finance company to pay over the reserve did not negate the existence of a fixed right to receive the reserved amount, within the meaning of the language quoted from *Spring City;* (b) the existence of contingent liabilities on the part of the dealer to the finance company, to which the reserve was subject, did not deny the existence of a fixed right to receive, for any use of the reserve in payment of those obligations would amount to something received by the dealer; and (c) income therefore accrued when the amounts withheld were entered on the books of the finance companies as liabilities to the dealers.[4]

We perceive no distinction of substance between automobile dealers' reserves and those of home builders. The practical problem and the solution are the same in both situations. The lending institution provides funds to relieve the vendor of receivables and thus to keep the vendor in capital; the vendor acquiesces in the reserve; the lender protects itself by it. The account is there for the benefit of the seller and he possesses "the right to receive" it within the context of income tax accrual accounting.

Key Homes, Inc., supra, 30 T.C. 109 (1958), although decided by the Tax Court prior to *Hansen,* applied to real estate sales what is essentially the rationale of *Hansen.* Judge Mulroney there followed the early real estate case of E. J. Gallagher Realty Co., 4 B.T.A. 219, 222–223 (1926). To the same effect are Carl B. Holland, T.C. Memo 1963–108 (Judge Arundell), and Warren G. Morris, T.C. Memo 1963–139 (Judge Fay). The Sixth Circuit's per curiam affirmance of Key Homes, 271 F.2d 280, came after the Supreme Court's decision in *Hansen* and flatly relied on *Hansen* as authority governing the real estate situation. It is, thus, precedent for the Commissioner here. So, too, is American Community Builders, Inc. v. Commissioner, 301 F.2d 7, 9 and footnote 5 (7 Cir. 1962).

The taxpayers, however, would distinguish or lessen the authority of *Hansen* and *Key Homes* on a number of grounds:

1. They would rely on Barham v. United States, 256 F.2d 456 (4 Cir. 1958). That decision, however, predated *Hansen.* Further, the court there followed Johnson v. Commissioner, 233 F.2d 952 (4 Cir. 1956), and Texas Trailercoach, Inc. v. Commissioner, 251 F.2d 395 (5 Cir. 1958), both of which were classified by the Supreme Court as contrary to the result it reached in *Hansen.* See footnote 1 on p. 450 of 360 U.S., on p. 1273 of 79 S.Ct. One district court

---

4. The direct effect of *Hansen* was somewhat ameliorated by the enactment of the Dealer Reserve Income Adjustment Act of 1960, 74 Stat. 124. This Act has no pertinency for this petition for review.

judge has rightly characterized Johnson v. Commissioner as "substantially eroded by the decision in *Hansen*". Noble Motor Co. v. United States, 231 F.Supp. 702, 704 (D.Md.1964). At this date, therefore, we are not persuaded by the authority of *Barham*.

2. They would distinguish *Hansen* on the ground that it concerned two separate transactions, that is, one between the dealer and the purchaser and the other between the dealer and the finance company, whereas, here, there is a "single three-cornered transaction" and the taxpayers never did "acquire a right to that portion of the purchase price represented by the share accounts", and hence deserve different tax treatment. It is true that Mr. Justice Whittaker, in *Hansen*, pp. 460–463 of 360 U.S., at pp. 1278, 1279 of 79 S.Ct. appears to have taken some pain to reject the contention by the taxpayers there that a three-cornered transaction was involved. However, we attach no particular significance to this. The dealers there were arguing that the reserves were the property of the purchasers and for that reason could not possibly be regarded as income accruable to the dealers. The present taxpayers do not deny that, if all goes well, the collateral share account balances will be paid to them and not to their vendees. Mr. Justice Whittaker certainly did not indicate that a different tax result would flow from a three-cornered transaction. The purchaser, after all, has no claim against the reserve balance; he can affect its disposition only by defaulting. See Family Finance, Inc., 32 T.C. 1193, 1196 (1959).

3. They would distinguish *Hansen* on the ground that the present taxpayers, in contrast with the *Hansen* dealers who indorsed with recourse, have no personal liability to Home for losses incurred on the mortgages and that Home is relegated for its protection to the collateral share accounts. They note the emphasis in the *Hansen* opinion on resulting benefit to the dealers if the reserves are utilized to satisfy the dealers' obligations. If benefit is important, it is present here,

too. The reserve in itself reflects an assumed, although limited, liability on the part of the taxpayer. When that liability is satisfied, benefit is realized. In any event, we view the distinction as one which occasions no different tax result; in either case, the reserve will come to the seller subject only to the normal credit risk of purchaser default. The purported distinction was noted and explicitly rejected in General Gas Corp. v. Commissioner, 293 F.2d 35, 38–39 (5 Cir. 1961), cert. denied 369 U.S. 816, 82 S.Ct. 826, 7 L.Ed.2d 783. The *Hansen* principle was deemed controlling in a non-recourse situation by the entire court in American Can Co., 37 T.C. 198, 218 (1961), modified on another issue, 317 F.2d 604 (2 Cir. 1963), cert. denied 375 U.S. 993, 84 S.Ct. 632, 11 L.Ed.2d 479. We observe, too, that some of the promissory notes in our own Glover case, reversed by the *Hansen* decision, were without recourse. See p. 736 of 253 F.2d and p. 455 and footnote 5 on p. 454 of 360 U.S., on p. 1275 of 79 S.Ct. Judge Raum, in his opinion in General Gas Corp., 33 T.C. 303, 304 (1959), observed that this feature was present in United States v. Hine Pontiac, 360 U.S. 715, 79 S.Ct. 1443, 3 L.Ed.2d 1539 (1959). Wood v. United States, 64–2 USTC, par. 9844 (N.D.Ala.1964), would lend support to the taxpayers but that decision has now been reversed. United States v. Wood, 352 F.2d 522 (5 Cir. 1965).

4. They would distinguish *Hansen* because the present taxpayers do not receive a defaulting purchaser's paper and, thus, it is said, "contingencies of more than time and collectibility were involved". We do not find that the Supreme Court in *Hansen* attached weight to the fact of a dealer's right to reacquire a defaulting customer's paper and we fail to see significance in that feature. Time and collectibility are still the contingencies. In any event, under local law, despite the absence of a specific contract, the taxpayers would be subrogated to any claim satisfied by a withdrawal from the share account. See

Phelps v. Scott, 325 Mo. 711, 30 S.W.2d 71, 75–76, 71 A.L.R. 290 (1930), and In re Phillips' Estate, 357 Mo. 947, 211 S.W.2d 728, 732–733 (1948).

5. They would distinguish *Hansen* because of the differences in the life of the instalment paper and in the time required for the release of the reserves, and they stress what they claim is a probable 12-year period here. Again, we find nothing meaningful in this distinction.

6. They would distinguish *Key Homes* on the ground that the reserve for each sale there was kept in a separate account, whereas here a pooling arrangement and, hence, greater risk of loss for the taxpayer are present. The Tax Court emphasized this separateness in Key Homes, p. 113 of 30 T.C., and felt that it made the case a stronger one for the Commissioner than the automobile dealers' reserve cases. But the Supreme Court, in its subsequent *Hansen* decision, was not bothered by pooling. It would, therefore, seem anomalous to reject the authority of *Key Homes* because of pooling.

7. Finally, they urge that the reserves have no ascertainable market values and that this bars accrual or, at least, permits accrual of only a nominal value. This argument rests on the stated requirement that under accrual accounting the amount of income be capable of determination "with reasonable accuracy". Treas.Reg. § 1.451–1(a). Although there is testimony about the difficulty in ascertaining market value of a taxpayer's interest in a share account, this suggestion is answered by the fact that includability here is to be measured by face value, which obviously meets the "reasonable accuracy" standard. Spring City Foundry Co. v. Commissioner, supra, 292 U.S. 182, 54 S.Ct. 644. See First Sav. & Loan Ass'n, 40 T.C. 474, 487 (1963).

■ We therefore agree with the Tax Court on the first issue and hold that the amounts credited to the collateral share accounts qualified as income properly accruable to the respective taxpayers.

B. The deduction issue. Despite the Tax Court's reservation, mentioned above, as to Builders' and Fairhills' compliance with formal requirements, the Commissioner now, "for purposes of these cases only", concedes the taxpayers' establishment of bad debt reserves. This shrinks the deduction issue down to the narrow question whether the taxpayers are to be denied the use and benefit of § 166(c) because they were guarantors and not creditors.

■ It is true, as the Commissioner states, that an accrual basis taxpayer normally may not accrue an item as an expense or loss where his liability is not fixed and the amount is not determined with reasonable certainty during the tax year. See, for example, Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930), and Dixie Pine Prod. Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944). It is also true, as the Commissioner points out, that the 1954 Code's § 462, which had no counterpart in prior law, contemplated, by subsection (a), a deduction for "a reasonable addition to each reserve for estimated expenses" which, by subsection (d), was to "be estimated with reasonable accuracy". It is argued that even § 462 would not have authorized a deduction for the taxpayers because their liability to Home could not be estimated with reasonable accuracy when amounts were credited to the collateral share accounts, and, anyway, § 462 was promptly repealed in 1955. 69 Stat. 134.

But the taxpayers seek relief by way of an addition to a reserve for bad debts. A deduction for this purpose has been statutorily recognized since it first appeared in §§ 214(a)(7) and 234(a)(5) of the Revenue Act of 1921. This may be an exception, so far as reserves generally are concerned, but it does exist and a taxpayer is entitled to its benefit whenever it is applicable.

The statute speaks only of "a reserve for bad debts". It does not say that the debts must be owed to the taxpayer. The Commissioner would impose this require-

ment because of inferences to be drawn from the following two portions of § 1.166–1 of his current regulations:

"(a) Allowance of deduction. Section 166 provides that, in computing taxable income under section 63, a deduction shall be allowed in respect of bad debts owed to the taxpayer. * * *

"(c) Bona fide debt required. Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. * * * * " 5

It is then said that no debtor-creditor relationship can exist between the purchaser and the taxpayer here unless and until the purchaser defaults in his obligation to Home and Home draws on the share account, and that this record does not show the emergence of any such relationship.

The taxpayers argue that the risk of economic loss up to the amount of the balances in the share accounts is the same whether they are creditors or guarantors and that, consequently, there is no reason to construe § 166(c) as creating a distinction based upon their status as one or the other.

In Putnam v. Commissioner, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), the Supreme Court held that a loss sustained by a guarantor who, having paid the obligee, is unable to collect from the obligor, was a bad debt loss, with all ensuing consequences, under § 23(k)(4) of the 1939 Code. The opinion in *Putnam* recognizes, 352 U.S. pp. 85–86, 77 S.Ct. 175, that upon a guarantor's payment, the debtor's obligation to the creditor moves to the guarantor and a debtor-

creditor relationship between those two then arises. But *Putnam* also emphasizes that no new debt thereby comes into being. The old one merely shifts. And there is language in that opinion, pp. 90–93, by which the Court stresses the similarity in economic position of a creditor and of a guarantor. *Putnam* is clearly authority that a guarantor's loss is a bad debt loss under § 166(a) of the 1954 Code.

The Commissioner relies on three supporting Tax Court decisions. Wilkins Pontiac, supra, 34 T.C. 1065 (1960), an opinion by Judge Drennen not reviewed by the court; Foster Frosty Foods, Inc., 39 T.C. 772 (1963), reviewed by the court, with one judge concurring in result, with three judges in special concurrence avoiding "the question whether *Wilkins Pontiac* should be followed", and with three judges dissenting; and Mike Persia Chevrolet, Inc., 41 T.C. 198 (1963), an opinion also by Judge Drennen, not reviewed by the court.

But the first of these was reversed by the Ninth Circuit. Wilkins Pontiac v. Commissioner, supra, 298 F.2d 893, 895 (9 Cir. 1961), where it was succinctly observed:

"Nowhere in the code or the regulations do we find any requirement that a § 166(c) reserve must relate to debts presently owing to the taxpayer. Rather, it would seem that it must relate to an existing debt as to which the taxpayer in the ordinary course of business may ultimately sustain a bad debt loss.

"We know from Putnam that losses sustained by the taxpayer pursuant to its contracts of guaranty are to be deducted under § 166(a). Section 166(c) plainly states that in lieu of *such deduction* additions to a reserve may be deducted."

And the second was reversed by the Tenth Circuit, Foster Frosty Foods,

---

5. This quoted language did not appear in prior regulations. See, for example, Regs. 118, § 39.23(k)–1, and Regs. 111, § 29.23(k)–1.

Inc. v. Commissioner, 332 F.2d 230, 233 (10 Cir. 1964), where it was said:

"[T]he tax concept of debt remains existent because of the continuing liability of guaranty. Putnam v. Commissioner * * *. The purpose of a reserve for bad debts, intended as it is to allow a deduction against current income for bad debts attributable to such income but arising later, would be defeated if its concept is limited to direct debt."

No petition for review appears to have been filed in *Persia*.

The Internal Revenue Service announced its unwillingness to follow the Ninth Circuit decision in *Wilkins Pontiac* as a precedent, even though certiorari was not sought. Rev.Rul. 62–214, 1962–2 C.B. 72. One district court has followed *Wilkins Pontiac*. Family Budget Service, Inc. v. United States, 64–1 USTC par. 9151 (S.D.Miss.1963), appeal dismissed by the Fifth Circuit. See, also, Burbank Liquidating Corp. v. Commissioner, 335 F.2d 125, 126–127 (9 Cir. 1964).

We thus have a situation where a divided Tax Court supports the Commissioner and where the courts of appeals and the one district court which have met the issue have all gone the other way. We find ourselves in accord with the latter group for we, too, find nothing in § 166(c) which supports the Commissioner's restrictive interpretation. And we feel that the implications of *Putnam* favor the taxpayers rather than the Commissioner. Debts did exist at the time the additions to the reserves were made. Although those debts were not then owing to the taxpayers, liability existed on their part. Realistically, the intendment of the statute is met and should not be thwarted by any formal distinction between creditor and guarantor. *Putnam* recognizes the conceptual identity of these terms in such a context. To the extent it is significant, we would regard the language of the current regulations as concerned primarily with the existence of a valid debt, as distinguished from a capital contribution. This is particularly true of § 1.166–1(c). If § 1.166–1(a), when literally read, is more narrow, then, we feel, it is not justified by the wording of the controlling statute.

■ We therefore join the Ninth and Tenth Circuits in holding that the benefit of § 166(c) is not to be denied a taxpayer merely because of his status as a guarantor.

It does not follow, however, that these taxpayers are automatically to prevail in their mathematical claims on the deduction issue. The statute requires that the bad debt reserve deduction be for "a reasonable addition". Because of its conclusion adverse to deduction, the Tax Court did not pass upon the reasonableness of the amounts asserted.

■ The taxpayers at the trial did present evidence as to reasonableness. There was testimony relative to the substantial risk incurred by a mortgagee (and thus by a guarantor of a mortgagee) who requires only a relatively low down payment; a possible dip in the economy; a possible change in the neighborhood which would cause a decline in property values; expenses incident to foreclosure; the likelihood that a purchaser with small equity will fail to maintain the property; and the slender market value, if any, of the collateral share accounts during the early years of the loans which they secure. Although the Commissioner presented no witnesses, he cross-examined the taxpayers' witnesses and obtained some concessions as to the forecasting of probable loss. There are, of course, instances where the courts, including ourselves, have refused to remand when a taxpayer presented in the Tax Court credible and convincing evidence on an issue and the Commissioner chose not to litigate that issue but to rest his case on another and unaccepted proposition. World Publishing Co. v. Commissioner, 299 F.2d 614, 623 (8 Cir. 1962); Galt v. Commissioner, 216 F.2d 41, 51 (7 Cir. 1954), cert. denied 348 U.S. 951, 75 S.Ct. 438, 99 L.Ed. 743. See Olsen's Estate v. Commissioner, 302 F.2d 671, 674 (8 Cir. 1962), cert. denied 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165.

We regard the present case, however, as one where the Commissioner has not so foreclosed himself. Commissioner v. Josephs, 168 F.2d 233, 237 (8 Cir. 1948), cert. denied 335 U.S. 871, 69 S.Ct. 167, 93 L.Ed. 415; Central Bank Co. v. Commissioner, 329 F.2d 581 (6 Cir. 1962). See Kalbac v. Commissioner, 298 F.2d 251, 254 (8 Cir. 1962). We remand in order that the Tax Court may make its factual determination on the issue of reasonableness. Inasmuch as the Commissioner has had his opportunity to present his case, we do not order a new trial. Instead, we leave to the Tax Court, in its discretion, the decision whether to make its determination upon the existing record. Poletti v. Commissioner, 351 F.2d 345 (8 Cir. 1965); Webber v. Commissioner, 219 F.2d 834, 836–837 (10 Cir. 1955); Levitt & Sons v. Commissioner, 160 F.2d 209 (2 Cir. 1947); McCarthy v. Commissioner, 139 F.2d 20, 21 (7 Cir. 1943).

The decisions of the Tax Court are affirmed on the issue of includability and reversed on the issue of deductibility. The cases are remanded for further proceedings consistent with the views herein expressed.