Glenn L. Bolling and Ila L. Bolling, et al. [1] v. Commissioner. Bolling v. Commissioner
Docket Nos. 2552-62 - 2555-62.
United States Tax Court
T.C. Memo 1966-216; 1966 Tax Ct. Memo LEXIS 70; 25 T.C.M. (CCH) 1120; T.C.M. (RIA) 66216; September 29, 1966
William H. Curtis and Roy C. Hormberg, Bryant Bldg., Kansas City, Mo., for the petitioners. Arthur B. Bleecher, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The Court of Appeals for the Eighth Circuit in Glenn L. Bolling v. Commissioner, 357 F. 2d 3 (C.A. 8, 1966), affirmed in part and reversed in part our Memorandum Opinion, T.C. Memo. 1964-143, in the same case and remanded for further proceedings. The facts are set out in detail in our original opinion and in the *71 opinion of the Court of Appeals. In order to set the stage for an examination of the issue on remand they may be summarized as follows: Glenn L. Bolling and Mae L. Hausmann were in the business of building and selling low and moderate priced homes in Kansas City, Missouri. The operated through a partnership, Bolling-Hausmann Builders, and two corporations, Fairhills Company and B & H Homes, Inc. The partnership and the two corporations will hereafter sometimes be referred to as "the sellers." The sellers' customers were usually unable to afford large down payments. Each of the sellers therefore entered into agreements with Home Savings Association of Kansas City, a savings and loan association hereinafter called "Association," to enable the buyers to obtain mortgage loans up to 95 percent of the appraised value of the homes. It was the policy of Association not to loan above 80 percent of such value. The agreements provided that Association should withhold that portion of each loan representing the difference between 90 percent of such value and the amount loaned. Association usually obtained a guarantee of the upper 20 percent of each loan, but not to exceed 90 percent of appraised *72 value, from the Mortgage Guarantee Insurance Company (hereinafter referred to as MGIC). The first year's premium on such insurance was paid by the sellers. Premiums for later years were added to the amount of the loan. Where Association did not obtain such insurance it withheld an amount equal to the difference between 80 percent of such appraised value and the amount loaned. The amounts withheld on each of the sales were pooled, but in separate accounts for each of the three sellers. To the extent that Association suffered any losses on foreclosures not compensated by MGIC insurance it was entitled to draw upon these accounts. With respect to each seller its entire account could be so drawn to make up such losses on any of the homes sold by it. The agreements provided for the release to the sellers of amounts held on deposit in accordance with schedules related to the rate at which buyers paid off the principal amounts of their loans. Each of the sellers reported income on the accrual basis. Builders did not report as income those portions of the sales proceeds that were withheld by Association. Fairhills followed the same course, except that in 1958 it took into income an amount *73 equal to 25 percent of the amount withheld in that year. Builders and Fairhills included the entire amounts withheld as sales proceeds on their own books of account, but they offset these amounts by additions to so-called contra accounts, which their accountant viewed as functional equivalents of reserves for bad debts. During its single year in issue B & H included the amounts withheld in income and claimed an offsetting deduction for an addition to a reserve for bad debts. Each of the sellers made annual additions to their "contra," or reserve accounts equal to the amounts withheld during that year, with the exception of Fairhills, which added to its "contra" account in 1958 an amount equal to 75 percent of the amount withheld in that year. In our original opinion, we held, and the Court of Appeals affirmed, that the sellers were required to include in income in the year of sale the total of all amounts withheld in such year. The sellers argued that even if they were required to include such amounts in income they were entitled to establish reserves for bad debts and to make reasonable additions thereto in the years of sale to reflect the likelihood that some part of the amounts *74 credited to their accounts would never be released to them. We held that the sellers were not entitled to establish such reserves since sellers were guarantors rather than creditors, [2] and the Court of Appeals reversed. On appeal respondent has conceded, for purposes of these cases only, that the sellers had complied with the formal requirements for the establishment of *75 such reserves. Thus the only question left in the case is whether the amounts the sellers added to their reserve accounts in the years in question were reasonable in amount. See section 166(c) of the Internal Revenue Code of 1954. The Court of Appeals remanded the case to us for a determination of that issue, leaving it to us to determine whether to order a new trial or to resolve the question on the basis of the existing record. The question of the reasonableness of petitioners' additions to reserves for bad debts was put in issue by the pleadings and was litigated by both sides at trial. The issue was argued by both sides on brief. The respondent, at trial, did not contest the issue as vigorously as he might have in that he contented himself with crossexamining petitioners' witnesses. Respondent has, however, no claim that he did not have fair notice and ample opportunity to litigate the issue fully. The record as it stands contains ample evidence to permit a finding on the question. We therefore do not order a new trial. The statute provides for the deduction of "reasonable" additions to reserves for bad debts "in the discretion of the Secretary or his *76 delegate." Section 166(c) of the 1954 Code. This Court has recognized that the deduction "presents substantial problems of administration, and it cannot be assumed that Congress intended either that the taxpayer's unrestrained judgment as to the propriety or wisdom of his method or that the [Court's] judgment in a particular case when not supported by broad administrative considerations as well as the taxpayer's individual premises should override the Commissioner's sound discretion." C.P. Ford & Co., Inc., 28 B.T.A. 156, 159 (1933). There is, however, no suggestion in the present case that respondent's disallowance of the additions in question was based upon the sort of "broad administrative considerations" which the statute envisages in making the deduction contingent upon the discretion of the Secretary or his delegate. On response to our order that the parties submit recomputations of petitioners' tax liabilities in accordance with the decision of the Court of Appeals "or otherwise move with respect thereto," the respondent moved this Court in the alternative to enter decision in its favor, order a new trial, or make a finding of reasonableness based upon the *77 rule of Cohan v. Commissioner, 39 F. 2d 540, 543 (C.A. 2, 1930). The latter suggestion strikes us as inconsistent with any reliance on respondent's part on the statutory language with respect to discretion, and respondent has made no argument based thereon. Therefore, as we view the case, petitioners' task is to prove that the additions claimed by them were reasonable. Cf. Paramount Liquor Co. v. Commissioner, 242 F. 2d 249, 251 (C.A. 8, 1957). The petitioners added an amount equal to the entire amount withheld by Association to their reserves for bad debts in each of the years in question. The issue is whether such additions were reasonable. The guarantee of the upper 20 percent of loans by MGIC was limited to that portion of the loans under 90 percent [3] of appraised value. That is, if a house were sold for its appraised value of $10,000 with a $500 down payment and a $9,500 loan, MGIC would not be liable for any amount if the buyer defaulted immediately and Association realized $9,000 (90 percent of appraised value) on foreclosure. The account of the seller in this example could be drawn upon by Association to make up its $500 loss. Thus, petitioners' *78 exposure to loss under the agreements was for all portions of Association's potential losses (plus expenses) on foreclosure, except for the designated portions of those loans which were covered by this MGIC guarantee. In all cases the amounts withheld guaranteed, inter alia, the uppermost parts of the loans and petitioners had exposure as to each loan. Each account represented a pooling of amounts withheld on sales by each seller. Each entire pool could be drawn upon to make good any loss on any home sold by that seller. Thus, a large loss on one home could seriously deplete the pool that had been built up over many sales. Returning again to our example of a $500 down payment and a $9,500 loan, $500 would have been withheld and deposited in the seller's account (the difference between 90 percent of appraised value and the amount of the loan). Multiplying this example ten times, the total amount in the pool would be $5,000. The total of loans *79 outstanding would be $95,000. Now let us assume that one buyer has made no amortizing payments. His home is foreclosed upon and sold at a very substantial loss. The pool would be drawn upon to make good the entire loss unless covered by MGIC, in which event the pool would be drawn upon for the top $500 plus all amounts of the loss below MGIC's guarantee of the top 20 percent of the loan. In any case where the pool was drawn upon in an amount greater than the share attributable to the particular house in question the collateral release provisions were suspended until loan repayments brought the pool back to a level sufficient "to maintain the original loan exposure contemplated of all the loans in the enumerated list." The amounts withheld by Association averaged approximately 3.5 percent of the face value of the loans during the years in question. The petitioners proved that the total loss potential on any loan, if foreclosed, would include two percent per year in depreciation, five or six percent to cover the cost of reselling, and two to four percent to cover the costs of repairs and redecorating. Hence, the total loss potential after five years was approximately 20 percent *80 of the value of the home, not including such loss as might be occasioned by deflation or other conditions adversely affecting the values in the neighborhood. The collateral release provisions were such that a buyer would have repaid his loan down to 90 percent (or 80 percent in cases where there was no insurance) before the full amount withheld with respect to his loan was released, even assuming no losses from foreclosures. One of the agreements provided for no collateral release until the loan was paid down to 70 percent of value. Another contained the following collateral release provision: (4) The remaining collateral shall be disbursed to the Sellers under the following conditions: * * *
(b) Beginning at the end of the second year and each succeeding year thereafter an exact determination shall be made of the amount of principal reduction accomplished by the payments on the loan in the second fiscal year and one-third of that amount of principal reduction shall entitle the Seller to a refund of the pledged collateral in that amount. The financing arrangements in issue were begun in 1958. The trial was in 1963. None of the collateral was released during this period. *81 The maximum term of the loans was 25 years. The sellers were reasonable in their expectations of not receiving any of the amounts withheld for a period of 12 years. When the financing arrangements here in question were begun in 1958 Fairhills Company added to its reserve for bad debts an amount equal to 75 percent of the value of the amounts withheld. The next year it added an amount equal to 100 percent. The company's accountant explained his reasons as follows: Q. Will you describe how you handled that matter as far as accounting was concerned with respect to the collateral share accounts of Fairhills Company for [1958]? A. The company's accountant at the time we went out to obtain the information had recorded the full amount of these deposits as part of the sales proceeds. In discussing the situation with Glenn Bolling and learning of the provisions relating to these share deposits, I felt that it was improper to show the entire amount as gross income from the standpoint that at that time and considering what I had learned from Glenn, we felt that the value of these accounts was not the full hundred per cent of the accounts. At that time we were dealing with only three deposits, *82 with respect to three houses that had been sold, and we arrived at a figure of twenty-five per cent as representing the value. We then reduced sales by seventy-five per cent and set up what was called on the books a contra account to reflect the seventy-five per cent evaluation or devaluation. * * *
Q. Would you explain to the court what the reason was, as an accountant, for increasing from the 75 per cent to 100 per cent? A. Well, at the end or at March 31, 1958, the first involved on Fairhills Company, we had only three houses involved, the collateral deposits, as I recall, totaled some thirty-six hundred dollars. The exposure, risk exposure to the company was in the neighborhood of thirty-five to forty thousand. I am not sure of the exact amount of the notes involved. At the end of fiscal 1959, March 31, 1959, we had gone up to some ten or eleven houses with a much greater risk exposure, two or three houses could conceivably wipe out the entire collateral deposit, depending on how large the losses were, and we felt because of the increased exposure, risk exposure, there was not a corresponding increase in the deposit, the exposure went up faster than the collateral deposits. *83 The accountant further testified: Q. Mr. Young, with respect to some of the factors that you considered in setting up these contra accounts and the reserve for bad debts at the full amount of the collateral share accounts, could you state to the court what some of the factors were that you had in your mind at that time in determining the reasonableness of the amounts which you set up in those contra or reserve accounts? A. Well, we thought of two things primarily. The major one is what risk is there involved with relation to these collateral deposits. The risk would be measured by the total amount of the loan involved on all these various houses compared to the possible loss on foreclosure of them. Here we are talking about the first losses, as I understand, all of these agreements were charged against the petitioners here. Q. As far as the risk is concerned, and again looking at the time at which these accounts were set up, are these tied in with a prediction, judgment, or guess, as to the future stability of the economy? A. From the standpoint of what would cause foreclosures, they would be. It is the way our client would lose on this is, of course, through a foreclosure *84 of a house and as you have changes in the economy, either locally or nationally, it would affect how well the borrowers can continue their payments. The accountant testified that in his opinion, based on his training and on his experience with other clients in the business of loaning money on real estate, the additions to reserves for bad debts were reasonable for financial accounting purposes. Bolling testified that at the time the accounts were set up he did not think they could have been sold for "ten cents on the dollar." The executive vice-president of Association, who had experience in financing low and moderate priced housing, testified as follows: Q. And what has been your observation insofar as the hazards involved with respect to low down payment loans? A. Well, generally, with low down payment loans, the borrower has less financial security due to the smaller equity, he generally does not maintain his home as well and naturally in the event of foreclosure, unless there has been a lot of inflation, there is not enough, near enough equity to liquidate the property to pay off the loan. * * *
Q. I believe you have been in court during the hearing today. From *85 your knowledge during the years in question of the financing business and from your experience with Home Savings and from your knowledge as you have previously testified to of the hazards of financing low and medium-priced homes involving down payments limited to five and ten per cent, and considering also the collateral accounts required by Home Savings of the petitioners, on these particular loans where they were required to collateralize this difference between the ninety per cent of the total and the ninety-five per cent, do you have an opinion as to whether the amount of such accounts, and I am referring to the collateral share accounts, whether the amount of such accounts did or did not constitute reasonable reserves for the petitioners for bad debts, in other words, in your opinion were these particular collateral share accounts reasonable reserves to be set up on their books? A. Yes, sir; I would say yes. Q. As far as these same reserves are concerned, do you have any knowledge as to any market value that they might have had during the years in question? A. At the time they were established I feel they did not have any market value. After the practices in question were *86 challenged by the Internal Revenue Service petitioners abandoned them and began discounting their buyers' notes at Association. The discount rate, to time of trial, had been as high as seven percent of the entire face amount of the notes. Both of petitioners' expert witnesses admitted on cross-examination that it would be difficult to predict with accuracy what actual losses on foreclosures would be. In the light of the other evidence, however, we do not feel that these concessions seriously weaken petitioners' case. At the time the additions to reserves in question were made petitioners had no actual experience on which to base their estimates of probable losses. The system of pooled accounts was different from the apparently more common practice of establishing separate accounts to guarantee repayment of each loan. Cf. Key Homes, Inc., 30 T.C. 109, affirmed per curiam, 271 F. 2d 280 (C.A. 6, 1959). It is obvious that the pooling system subjected the amounts withheld to greater risk of loss because the amount withheld on one sale could be called upon to make up losses on other sales. As the years went by it might have developed that the petitioners were *87 unduly pessimistic, in which event the additions should then be reduced. Having reviewed the entire record we conclude that petitioners have proved, for these early years which are before us, that the additions made to reserves were reasonable. Cf. Cullers v. Commissioner, 237 F. 2d 611 (C.A. 8, 1956), and Bright v. United States, F. Supp. , (N.D. Tex. 1966), 18 A.F.T.R. 2d 5383. Decisions will be entered under Rule 50 in Docket Nos. 2552-62, 2553-62 and 2555-62. Decision will be entered for the petitioner in Docket No. 2554-62. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Mae L. Hausmann, Docket No. 2553-62; Fairhills Company, Docket No. 2554-62; and B & H Homes, Inc., Docket No. 2555-62.↩
2. In our original opinion, T.C. Memo. 1964-143, we said: We realize that the economic realities justify deductions for a reasonable amount of additions to bad debt reserves. There is the possibility that petitioners will suffer bad debt losses regarding some of the relevant amounts. See Putnam v. Commissioner, 352 U.S. 82, where it is established that such losses will be deductible under section 166(a)↩ when incurred. In view of the long period which petitioners must remain liable in the instant case, and with cognizance of the "boom and bust" nature of the building trade, it does seem unfair that petitioners are not allowed to afford themselves the benefit of bad debt reserves. Income is bunched in "boom" years and corresponding deductions in "bust" years may be of little value.
3. This percentile of the upper limit of MGIC's guarantee decreased, pro rata, as the loan was amortized (about 2 percent per year), so that the top 5 percent of the loan remained unguaranteed, and a potential liability of petitioners.↩