**Paul V. RAMSEY, Appellant,**

v.

**FIRST NATIONAL BANK AND TRUST COMPANY OF CORBIN, Appellee.**

Court of Appeals of Kentucky.

Aug. 24, 1984.

Discretionary Review Denied
Feb. 21, 1985.

Larry G. Bryson, Bledsoe, Little, & Bryson, London, for appellant.

Darrell L. Saunders, Forcht, Hoskins & Saunders, Corbin, for appellee.

Before CLAYTON, McDONALD and MILLER, JJ.

CLAYTON, Judge.

This appeal involves an action on a note made payable to the First National Bank of Corbin, Kentucky, by Granville Brock and Paul Ramsey as co-signers. A judgment for First National of $23,459.83 was entered against Paul Ramsey following a jury trial held in Knox Circuit Court on March 17, 1983. Ramsey now appeals arguing that he was entitled to a directed verdict under KRS 355.3–606, our state's codification of Uniform Commercial Code § 3–606 entitled "impairment of recourse or of collateral." Supposedly, when First National released Brock from his obligation to pay in exchange for one-half the balance then due on the note, $12,500, it simultaneously discharged Ramsey from his own payment obligations under the note by operation of law. This second discharge is allegedly due to the bank's failure to obtain Ramsey's consent to the release. See KRS 355.3–606(1)(a). Alternatively, Ramsey claims that he is otherwise independently entitled to discharge by the bank's unjustified impairment of the equipment collateral put up as security for the loan. See KRS 355.3–606(1)(b). We disagree on both accounts and affirm the judgment of the circuit court.

Ramsey, as a co-maker on the note, is not protected by the discharge provisions of KRS 355.3–606(1). See Wohlhuter v. St. Charles Lumber & Fuel Co., 62 Ill.2d 16, 338 N.E.2d 179, 181–82 (1975); Holcomb State Bank v. Adamson, 107 Ill. App.3d 908, 63 Ill.Dec. 704, 706, 438 N.E.2d 635, 637 (1982); Hooper v. Ryan, 581 S.W.2d 237, 238–39 (Tex.Civ.App.1979). Only those persons who stand in the position of sureties as accommodation parties or guarantors are safeguarded. The "any party to the instrument" language of KRS 355.3–606(1) is intended to apply to those individuals signing ostensibly as makers but who in fact are sureties or accommodation makers. See KRS 355.3–606(1), commentary to Banks-Baldwin edition.

Given the evidence presented at trial we cannot accept the argument that Ramsey's signature appears on the note as an accommodation maker simply to facilitate a loan for Brock. At the time of the loan, the two were partners in B & R Road Boring & Tapping Company (B & R) by a previously executed partnership agreement. Their signatures appear in their capacity as partners on the security agreement accompanying the loan, the proceeds of which were placed in an account especially created for B & R. Further, Ramsey, on behalf of B & R, drew checks against the account for payment of B & R employee wages. He additionally executed a contract for the installation of sewage lines on behalf of B & R with the City Utilities Commission of Corbin, Kentucky, approximately a year after the execution of the note. Therefore, under the "purposes and benefits" test, used to determine the intent of persons signing as makers but claiming accommodation status, Ramsey is a co-maker, not an accommodation maker covered under KRS 355.3–606(1).

KRS 355.3–606(1), receiving very little attention by our courts, provides,

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

(a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure or delay in effecting any required presentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary; or

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

(2) By express reservation of rights against a party with a right of recourse the holder preserves

(a) all his rights against such party as of the time when the instrument was originally due; and

(b) the right of the party to pay the instrument as of that time; and

(c) all rights of such party to recourse against others.

 In simpler terms, it protects a surety by relieving him, in part, or sometimes totally, of his obligation to answer for the debt or default of the principal debtor where any holder of an instrument: (1) acts to limit the surety's possible recovery against the principal debtor, either by releasing him from his obligation to pay, agreeing not to sue him, or otherwise discharging him; or (2) acts to reduce the surety's protection by unjustifiably impairing collateral taken as security on the instrument. The language of the statute applies not only to actions taken between holders and principal debtors, but also to actions taken between holders and "any person against whom the party [the surety] has to the knowledge of the holder a right of recourse," including persons whose signatures may not appear on the instrument. However, not every release, discharge or agreement not to sue that passes between a holder and a principal debtor, or other person, will automatically result in a surety's discharge. Two separate conditions must both be present in order for discharge to occur under KRS 355.3–606(1)(a). The surety must not have given his consent to the modification of the debtor/creditor relationship. Furthermore, the holder must not have made an express reservation of rights against the surety. Cast in the language of the Uniform Commercial Code,

The creditor can forestall a surety's claim of discharge under 3–606 in either of two ways. First, he may procure the surety's express or implied consent to the modification in the relationship with the debtor. Second, by adding a sentence to the modification agreement to "expressly reserve" his rights against surety, he bars a discharge.

J. White and R. Summers, *Uniform Commercial Code* § 13–15 (2nd ed. 1980). As for the second part of the quoted portion of the statute, KRS 355.3–606(1)(b), a surety may also be discharged when, without his consent, the creditor handles the collateral carelessly so as to reduce its value, make it unavailable to the surety, or otherwise impair the value of the security interest. In this respect, the creditors' conduct with regard to the collateral is judged under the "reasonable care" standard of KRS 355.9–207. *See White & Summers, supra,* at 526. Therefore, in general terms, KRS 355.3–606 can be said to protect sureties whose risk of payment under the terms of an instrument has been increased either by agreement between a holder and a person against whom there is a known right of recourse made without a surety's consent or a creditor's reservation of rights, or by careless handling of the collateral by the creditor so as to impair the security interest therein. We do not presume by this abridged explanation of KRS 355.3–606(1) to have fully explored its complexities. Instead, we view the above passages as merely a brief, but beneficial, introduction to an extremely complex area of commercial law.

Turning now to the facts, throughout 1969, Brock and Ramsey were engaged in the construction of waterlines in Harrods-

burg, and earlier in Paris, Kentucky. While working in Paris, the two men began discussing the formation of a partnership between them. Apparently Brock, Ramsey's brother-in-law by Ramsey's marriage to Brock's sister, had been, until that time, sole owner of the waterline construction business. On March 31, 1969, a partnership agreement creating B & R Road Boring & Tapping Company was entered into by Ramsey and Brock. Under the terms of that agreement Brock, as partner, was to contribute "several thousands of dollars as capital," and Ramsey was to "contribute his time and knowledge to the institution of the partnership business . . . ." During the month following execution of the agreement, Brock approached Randolph Stivers, executive vice-president of First National, about securing a loan. Stivers maintains that in the negotiations that followed between himself and Brock, the loan was discussed in terms of the B & R partnership, though Ramsey was never involved in these meetings. On April 25, 1969, a note in the principal amount of $30,000 at an interest rate of 7% per annum was executed in the bank's favor by Brock. Ramsey's signature was apparently obtained a short time thereafter, Ramsey being in Harrodsburg, Kentucky, on the 25th of April. No indication appears on the face of the note of the capacity in which the partners signed other than the introductory clause, "after this date *we* promise to pay." (our emphasis). On the same date, a security agreement was executed granting First National a security interest in four pieces of equipment used in the business: a backhoe, a boring machine, a drilling machine, and a tapping machine. Beneath the signatures of Brock and Ramsey is the typed addition "doing business as B & R Road Boring & Tapping Company." Once again, Ramsey's signature was apparently obtained and notarized at a later date. Concurrently with the execution of the note and agreement, an account in the name of B & R was opened at First National by Brock and the entire proceeds of the loan placed therein. Over the course of the next four weeks, Ramsey drew five checks against the B & R account on form checks including the name of the partnership above his signature. Brock did not join in signing the instruments, though a second line was included on the face of the checks. From the testimony at trial, these checks were apparently drawn to pay B & R employees.

Without notice to Ramsey, and in direct contravention of the partnership agreement, Brock, on December 31, 1969, incorporated B & R listing himself as sole stockholder of the corporation. Upon learning of the incorporation in the early part of 1970, Ramsey created his own construction company, Ramsey Construction Company, in which he was sole proprietor. However, as late as March 4, 1970, Ramsey was still transacting business in the name of B & R. On that date, he entered into agreement with City Utilities Commission of Corbin, Kentucky, for installation of waterlines in Corbin, signing the document beneath the typewritten language "B & R Road Boring Company By." The performance bond executed between Fireman's Fund of America and Ramsey two days earlier on March 2, 1970, also contains the same language preceding his signature.

During this entire period of time, the collateral for the loan had been kept at the farm of Granville Brock north of Corbin, Kentucky. The bank did not take possession of the equipment nor did it take any other step to safeguard it. Sometime during 1970, Brock, without notice to the bank or Ramsey, disposed of the backhoe by sale to a pipeline construction firm in Lexington, Kentucky. Due to a prior recorded lien, of which the bank had no knowledge, it having elected to forego an examination of the lien records, the proceeds of the sale were taken by the Corbin Deposit Bank as superior lien holder. Following notice of the completed sale, First National ratified the transaction. In September of 1971, Brock again sold collateral on the note. This time a drilling machine and tapping machine were sold by check payable to B & R and First National and signed by both Brock and Ramsey. The entire amount of

the proceeds, some $3500 was applied against the outstanding balance of the note on September 25, 1971. As with the previous sale, neither the bank nor Ramsey received prior notice. Once again the bank ratified Brock's actions. No effort was ever made by Brock, Ramsey, or the Bank to dispose of the boring machine. The only other action taken concerning the remaining collateral occurred in August, 1973. At that time, $300 received from Charles Brock for use of the boring machine was applied to the balance of the debt. Ramsey, as before, was not informed of the use or the application of the user fee. Indeed, throughout the nine years from the time of Brock's release from liability for payment on the note on February 16, 1972, until the present action was instituted in December, 1981, Ramsey was never directly informed by Granville Brock or the bank of any disposition of the collateral, default on the note, or release of Brock. That release was accomplished by an agreement between Stivers and Brock containing, in part, the following language,

> It is understood that this Release does not waive any right that the undersigned has against the afore-mentioned Paul V. Ramsey for the balance of the indebtedness owing, nor does this Release waive any right of the undersigned to take possession of any collateral securing the payment of the aforesaid note and to apply the proceeds thereof toward the balance of indebtedness owing.

As consideration for the release, Brock paid First National $12,500 in cash which was applied to the outstanding balance on the note. Apparently there is some confusion at this point as to what note Brock was released from. The note mentioned on the face of the release is described as being "dated August 25, 1971." Whether this date indicates a renewal of the 1969 note, a separate note later executed, or simply a typographical error is unclear. Given the bank's refusal to sue Brock on the 1969 note and the appellant's failure to produce evidence of a separate note, we must assume that the difference in dates is but a typographical error.

Following execution of the release, the loan was declared in default on February 25, 1972. Sometime during that year, the testimony is not specific as to the exact date, Stivers, Ramsey, and William Hensley, a local attorney who had drafted the security agreement involved, met at First National to discuss the note. Upon being informed that he was personally responsible for the balance due, Ramsey advised First National that legal action would be necessary to recover payment. In December of 1981, Ramsey discovered from reading the Corbin Times, that he had been sued by First National. Examining his records, in 1982, Ramsey found a small document entitled "notice of note due," dated August 25, 1970. Listed on the document as maker appears the name of "Granville Brock." In a separate section entitled "endorsement or collateral" appears the name "Paul Ramsey" along with the abbreviation "sec. agreement."

In essence, this document summarizes Ramsey's defense. Throughout his testimony at trial he consistently maintains that the two men were merely contemplating a partnership which would be effected upon Brock's successful acquisition of $30,000. Ramsey's signature on the note was thus merely a means to facilitate Brock's personal loan. As evidence of such an arrangement, Ramsey points to the fact that at no time did he share in the profits of B & R. He was merely an employee foreman, apparently authorized to pay employees under his control and bind B & R on contracts of employment. After the short existence of B & R, he and Brock went their separate ways with Ramsey having minimal involvement on matters involving the note.

■ We cannot accept this characterization of the facts. The partnership agreement executed between Brock and Ramsey is not expressly conditioned upon the acquisition of capital by Brock, though it does mention that "It is contemplated that the partner, Granville S. Brock, shall contribute several thousands of dollars as capi-

tal." Ramsey's own testimony as to his purpose in executing the 1969 note reveals that he did not sign simply to assist Brock in securing an otherwise unobtainable loan. When asked what caused him to execute the note, Ramsey responded,

> Granville Brock told me that he borrowed thirty thousand dollars from First National Bank and asked me if I would go down and sign, since we were going to be partners. Mr. Stivers requested that I sign.

This testimony coincides with Stivers' recollection of events as being discussed in terms of partnership. It is further corroborated by the creation of a partnership account, issuance of checks under that account by Ramsey, and Ramsey's own actions in representing the partnership in contracting with the City of Corbin. That Brock repeatedly breached the terms of the partnership agreement is immaterial to the determination of Ramsey's obligations under the note.

▪ The legal status of signers to negotiable instruments as co-makers or accommodation makers turns upon the intentions of the signers at the time of execution. *See Farmers State Bank of Oakley v. Cooper*, 227 Kan. 547, 608 P.2d 929, 934 (citing L. Anderson, *The Uniform Commercial Code* § 3–415:9 (2nd ed. 1971)). As *Farmers State Bank, supra,* correctly states,

> Two primary factors are indicative of accommodation status: (1) no benefits from the proceeds of the instrument are received by the accommodation party, and (2) the signature is needed by the maker to acquire the loan.

*Id.* (citing Annotation, 90 A.L.R.3d 342 (1979)). Dubbed the "proceeds" and "purposes" test, these two standards have been applied either jointly or individually to determine the accommodation status of a party in numerous decisions involving section 3–606 of the Uniform Commercial Code. *E.g., Stockwell v. Bloomfield State Bank,* 367 N.E.2d 42 (Ind.App.1977); *Lasky v. Berger,* 536 P.2d 1157 (Colo.App.1975). *See also, White & Summers, supra,* at

521–22 (citing *Riegler v. Riegler,* 244 Ark. 483, 426 S.W.2d 789 (1968); *MacArthur v. Cannon,* 4 Conn.Cir. 208, 229 A.2d 372 (1967)). As stated earlier, absent surety status as an accommodation maker under the above test, a co-maker cannot rely on KRS 355.3–606. *See Wohlhuter v. St. Charles Lumber & Fuel Co., supra* 338 N.E.2d at 181–82; *Holcomb State Bank v. Adamson, supra,* 63 Ill.Dec. at 706, 438 N.E.2d at 637; *Hooper v. Ryan, supra* 581 S.W.2d at 238–39.

▪ Quite clearly Ramsey fails under either branch of the test. His own testimony indicates his signature was not added simply to secure an otherwise unobtainable loan. Following execution of the note he made repeated use of the proceeds to pay workmen in his employ thus directly benefiting from the extension of credit. A much clearer picture of the nature of an accommodation party to a business loan is presented in *Holcomb State Bank v. Adamson, supra.* In *Holcomb,* the defendant Adamson co-signed a $10,000 note for a loan to his son-in-law, Wick, for use in his mushroom growing business. The bank would not approve the loan without Adamson's signature, and Adamson did not receive any of the proceeds therefrom, which were deposited in Wick's pre-existing business account. Adamson was thus determined to fit the classic definition of an accommodation maker found in section 3–415 of the Uniform Commercial Code and codified in our own statutes at KRS 355.3–415(1),

> An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

Ramsey does not fall within this category. However, even were we to declare him an accommodation maker, and some evidence arguably supports that conclusion, our result would remain unchanged. Analysis of KRS 355.3–606(1) under the present facts reveals that Ramsey is not entitled to protection under either subsection (a) or (b). The bank's reservation of rights clause is sufficient to preserve its rights against

Ramsey regardless of his lack of consent. Thus, subsection (a) is of little benefit. Further, subsection (b) offers no solace for two reasons. No unjustifiable impairment occurred and, assuming the contrary, had any occurred no evidence of its extent was offered by the appellant at trial.

There was no unjustifiable impairment of the collateral. The pre-existing lien placed on the backhoe was easily discoverable by First National or Ramsey had they chosen to look before signing the security agreement. First National had no part in creating that superior interest and therefore cannot be said to have impaired its and Ramsey's interest in the backhoe. As Ramsey retroactively consented to the sale of the drilling and tapping machine by his signature on the buyer's check, the entire proceeds of which were applied against the debt, no impairment can be considered to have resulted there. Finally, as to the final piece of equipment collateral, the boring machine, there is simply no evidence in the record as to its value or any reduction therein. Presumably either Ramsey or the bank may secure this equipment, sell it, and apply the proceeds to reduce the debt. Assuming that the bank did unjustifiably impair the collateral, Ramsey has totally failed to present any evidence of the extent of that impairment. A defendant debtor relying upon a defense of unjustified impairment of collateral under KRS 355.3–606(1)(b) bears the burden of proving the nature and extent of such impairment. In the absence of that necessary proof he cannot successfully assert the defense.

The judgment of the Knox Circuit Court is affirmed.

All concur.