**LANDMARK KCI BANK, Respondent,**

v.

**Brett MARSHALL, et al., Defendant,**

**Don and Nancy Marshall, Appellants.**

**No. WD 41431.**

Missouri Court of Appeals,
Western District.

Dec. 12, 1989.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
Jan. 30, 1990.

Application to Transfer Denied
April 17, 1990.

**134**

James Franklin Ralls, Jr., Kansas City, for appellants.

Lyle Louis Odo and Kathryn Wheelock, Platte City, for respondent.

Before SHANGLER, P.J., and TURNAGE and KENNEDY, JJ.

SHANGLER, Presiding Judge.

The defendants Don Marshall and Nancy Marshall appeal from a judgment entered against them as accommodation makers of a promissory note made payable to the plaintiff Landmark KCI Bank. They contend that they were discharged from liability on the instrument by the release by the Bank of Stacy Marshall, a maker on the note.

The judgment was for a deficiency balance on the fourth in a series of promissory notes given to evidence an original indebtedness of $80,000. Each previous note was cancelled and extinguished as *paid by renewal.* The original note was executed on October 1, 1981, by Brett Marshall and Stacy Marshall [then his wife] as borrowers, and bore the signatures of Don Marshall and Nancy Marshall [the parents] and Richard Nickerson and Jeanne Nickerson—husband and wife. The note for $80,000 was due on August 1, 1982, and bore interest at the rate of 18.5 percent per annum. The money from the loan was for Brett Marshall, then a farm employee of the Nickersons, to purchase farm equipment from Richard Nickerson. The machinery became security for the promissory note.

The obligation on the original note was reduced to $73,992, and on August 1, 1982, was replaced by a renewal instrument prepared by the Bank for signatures of the original six parties. The note was signed by all of them except Stacy Marshall. No payment was made during that year, and on August 1, 1983, the Bank prepared another renewal note for six signatures that recited the same principal amount and the same rate of interest. Stacy Marshall did not sign that renewal note. A third renewal note was executed by the same five signatories on August 1, 1984, for $69,992 due on February 1, 1985, and payable at the rate of interest of 14 percent per annum. That note was unpaid on the due date, but Richard and Jeanne Nickerson refused to sign another renewal note. The Bank and the three Marshalls, Brett and his parents, agreed to extend payment of the August 1, 1984 note at the reduced interest rate of 10 percent per annum and

payment of principal and interest in the sum of $500 per month. Brett Marshall defaulted, and an unpaid principal balance of $31,725.02 together with accrued interest of $4,267.87 remained after the sale of the security. The demand for payment of the deficiency was not honored.

The Bank instituted suit for the deficiency and for an attorney fee under the terms of the August 1, 1984, promissory note. The six signatories on the *original* note of October 1, 1981, were joined as defendants, and included Stacy Marshall. The defendants Nickerson counterclaimed against the Bank—on what theory, does not appear. The Nickersons did not appear at the trial and the counterclaim was dismissed on the motion of the Bank for failure to prosecute. The defendants Don Marshall and Nancy Marshall cross-claimed for indemnity against the defendants Nickerson as did the defendant Brett Marshall. The Nickersons invoked the protection of the bankruptcy laws, and the cross-claims for indemnity against them were stayed in accordance with 11 U.S.C. § 362.

In the course of the pendency of the action, the plaintiff Bank dismissed the claim against Stacy Marshall with prejudice. Thereafter, the defendant Don and Nancy Marshall moved for summary judgment on the ground that the release of Stacy Marshall from her obligations on the original promissory note without their consent impaired their right of recourse against that signatory and discharged their liability to the plaintiff Bank under the note. The motion was denied.

The court received evidence on the claim of the plaintiff Bank, denied the contention of the Marshall parents of release from accommodation liability on the note, and entered judgment against the defendants Brett Marshall, the parents Marshall and the Nickersons for the principal sum of $31,725.02 together with $4,267.87 accrued interest and daily interest of $6.69 from the date of judgment, and an attorney fee of $8,925. The defendants Nickerson filed for bankruptcy and the effect of the judgment as well as of the cross-claims for indemnity against them of the Marshalls—parents and son—was stayed.

The defendant Brett Marshall does not contest the judgment, nor—of course—do the Nickersons. The appellants are the defendants Don and Nancy Marshall, parents of Brett Marshall. They make one essential contention, replicated as a complaint from the denial of summary judgment and as an aggrievement from the judgment on the merits. It is that the release by the Bank of Stacy Marshall, a co-maker on the note, without their consent as accommodation makers, impaired their right of recourse against that debtor party and so operated to discharge their liability on the instrument.

The propriety of an order to deny summary judgment is not appealable. The issues raised by the pleadings nevertheless remain in the case, and when decided on full evidence are then properly subjects of an appeal. *Parker v. Wallace*, 431 S.W.2d 136, 137[1, 2] (Mo.1968). We turn then to the contention of the Marshall parents that the judgment of liability adjudged against them as accommodation makers on the promissory note to the Bank was error because the release by the Bank of Stacy Marshall, a co-maker of the obligation, discharged their liability on the instrument under precepts of the Uniform Commercial Code.

That argument rests on premises that (1) Stacy Marshall signed the promissory note of October 1, 1981, in the capacity of co-maker; (2) the Marshall parents as accommodation makers were entitled to recourse against Stacy Marshall by way of subrogation for any payment of that paper they made to the holder Bank; (3) release of the co-maker Stacy Marshall from that instrument without consent of the Marshalls impaired that right of recourse and operated to discharge them from liability on that paper.

Two of these premises questioned the express findings entered by the trial court adjunctive to the judgment:

On October 1, 1981, *Stacy Marshall* signed her name to said promissory note in the capacity of Brett Marshall's wife

in order for Brett Marshall to purchase equipment for his farming business and she *was* therefore *an accommodation maker* both as to her husband and to defendants Richard Nickerson, Jeanne Nickerson, Don Marshall and Nancy Marshall.

Based upon the evidence taken as a whole and the credibility of the parties and witnesses that testified, the court finds that *plaintiff's discharge of Stacy Marshall* on the October 1, 1981 note *was consented to . by accommodation makers* Don and Nancy Marshall and Richard and Jeanne Nickerson [emphasis added].

We respond to the contentions of error as posed by the appellants Don and Nancy Marshall. Whether Stacy Marshall signed the promissory note of October 1, 1981, in the capacity of co-maker or of accommodation maker determines the extent of recourse open to Don and Nancy Marshall as accommodation makers against Stacy Marshall, but does not affect their right to release from liability on the paper if, as they contend, the holder Bank discharged Stacy Marshall from their obligation on the note without their consent.

### Stacy Marshall: Co-maker or Accommodation Maker?

 The contract liability of the maker of a note is unconditional and absolute. The maker engages to pay the instrument according to its tenor, and is obligated to pay a time instrument [such as the note of October 1, 1981] on the day after maturity. §§ 400.3–413(1), .3–122(1)(a), RSMo 1986 [1]; I J. White and R. Summers, Uniform Commercial Code § 13–6 at 634–635 (3d ed. 1988) (hereinafter *White & Summers*). Unless the instrument specifies otherwise, persons who sign as makers as part of the same transaction are jointly and severally liable. § 400.3–118(3); *Wright v. Wright*, 567 S.W.2d 371, 374[1, 2] (Mo.App.1978). A maker who pays the instrument is entitled to contribution from other co-makers. *Transwestern Indus., Inc., v. Shue*, 537 S.W.2d 848, 849[1, 2] (Mo.App.1976); Re-

statement of Restitution § 85 & comment e (1937).

 A co-maker may be an accommodation party. Section 400.3–415 of the Uniform Commercial Code provides:

(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

(2) ... [T]he accommodation party is liable in the capacity in which he has signed ...

If the accommodation party signs in the capacity of a maker, the basic liability of the signer to the holder is that of any other maker. *Schulte Transp. Co. v. Hewitt*, 299 S.W.2d 568, 575[5–7] (Mo.App.1957); § 400.3–413(1). The essential distinction between an accommodation maker and a usual maker is that an accommodation party is a surety, whereas a non-accommodation maker is not. § 400.3–415 comment 1. And under principles of suretyship, the accommodation party who pays is subrogated to the rights of the paid holder, and has recourse for reimbursement against the accommodated party for any payment made on the instrument. § 400.3–415(5) & comment 5; 6 R. Anderson, Uniform Commercial Code § 3–415:1 at 342 (3d ed. 1984) (hereinafter *Anderson* ). In addition, an accommodation party may plead defenses available to a surety, but not to other parties on the instrument: discharge from liability because the holder releases a person against whom the accommodation party has a right of recourse or because the holder unjustifiably impairs recourse to collateral for the instrument. § 400.3–606(1)(a), (b) & comment 1. A co-maker who is not an accommodation party is not a surety, and so is not a person with "a right of recourse" under § 400.3–606, and is not entitled to the defenses of a surety. *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 56 Ill.Dec. 14, 21, 427 N.E.2d 94, 101[8] (1981); *El–Ce Storms Trust v. Svetahor*, 223 Mont. 113, 724 P.2d 704, 707 (1986); *White & Summers*, § 13–16 at 667.

1. All Missouri statutory references are to RSMo 1986.

The appellants Don and Nancy Marshall argue insistently that Stacy Marshall signed the October 1, 1981, promissory note not in the capacity of accommodation maker, but as co-maker and so is liable in that capacity. They then assert the effect of *Bishop v. United Missouri Bank of Carthage*, 647 S.W.2d 625 (Mo.App.1983) that co-makers as well as accommodation makers come within the provisions of § 400.3–606 so that the holder discharges any party to the instrument with a right of recourse without consent of that party. *Bishop* held that the release by the holder of a co-maker discharges the other maker to the extent of the right of recourse. The appellants draw from that rationale that "the discharge under the statute would release an accommodation maker completely." The argument is as irrelevant to the question posed for review as is the decision in *Bishop*.[2]

The question here is not the discharge of a co-maker [as in *Bishop*], but the discharge of an accommodation party—the Marshalls—from liability on the instrument. The discharge of the Marshalls in at least some measure follows in law whether Stacy Marshall was a co-maker, or just another accommodation maker on the paper. The discharge—full or at least pro tanto—of the Marshalls follows in law whether Stacy Marshall was a co-maker, or just another accommodation maker on the paper. In either event, the discharge under § 400.3–606 issues on principles of subrogation and suretyship, and not [as *Bishop* has it] from any obligation of contribution between co-makers. That is because an accommodation party is always a surety—it is its distinguishing feature. § 400.3–415 comment 1. If Stacy Marshall was a co-maker, her release by the holder without the consent of the accommodation makers Marshall, impaired their right of recourse as sureties against her to be reimbursed from a principal debtor, and so entitled them to full discharge. § 400.3–415(5) & comment 5; *Kellett v. Stanley*, 153 Ga. App. 854, 267 S.E.2d 282, 284[2] (1980); *Anderson*, § 3–415:46 at 368. If Stacy Marshall was co-accommodation maker, her release would also discharge the accommodation makers Marshall, but to the extent of the contributive share of Stacy Marshall, the released surety. §§ 433.110, .120; *Phelps v. Scott*, 325 Mo. 711, 30 S.W.2d 71, 76 (1930); *Schneider v. Maney*, 242 Mo. 36, 145 S.W. 823, 824[5] (1912); Restatement of Security § 135(1) & comment g (1941).[3]

The extent of any suretyship between the accommodation makers Marshall and Stacy Marshall, therefore, depends upon whether Stacy Marshall signed the October 1, 1981, promissory note as a co-maker or as an accommodation party—and if as an accommodation party, then in what capacity. The Uniform Commercial Code defines an accommodation party as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." § 400.3–415(1). An accommodation party becomes liable "in the capacity in which he has signed." § 400.3–415(2); *McIntosh v. White*, 447 S.W.2d 75, 78[6–10] (Mo.App.1969). A person who signs a note in order to enable another party to the paper to obtain a loan is an accommodation party. *Ibid.; Lindsey v. Zeller*, 10 Kan.App.2d 4, 690 P.2d

**2.** *Bishop* does not impinge on our decision, and we make no further response to its validity as precedent. We note here only that the rationale of *Bishop*—the right of a non-accommodation party co-maker to contribution from another non-accommodation party co-maker is a right of recourse on the instrument—has been emphatically criticized in I J. White & R. Summers, Uniform Commercial Code § 13–16, at 669 3d ed. (1988). *See also Great Southwest Life Ins. Co. v. Frazier*, 860 F.2d 896 (9th Cir.1988).

**3.** The Uniform Comercial Code expressly provides that an accommodation party who pays the instrument has a right of recourse on the instrument against the accommodated party [§ 400.3–415(5)], but contains no comparable provision with the right of an accommodation party to contribution from another accommodation party. It does make provision, however, that "[u]nless displaced by the particular provisions of the [Code]," the common law continues to apply. § 400.1–103. It is a settled principle of our law that an accommodation maker has a right of contribution from a co-accommodation maker on premises of suretyship. § 433.110; *Phelps v. Scott*, 30 S.W.2d at 76; *Schneider v. Maney*, 145 S.W. at 824; Simpson, Handbook on the Law of Suretyship § 79 (1950)

394, 395[1] (1984). Whether a person is an accommodation party is a question of the intention of the putative accommodation party, accommodated party, and of the holder of the paper at the time of the signatures. *Anderson*, § 3–415:16 at 351. Whether a party to a negotiable instrument is a co-maker or accommodation maker depends upon the intentions of the signers at the time of the execution of the paper. *Utah Farm Prod. Credit Assn. v. Watts*, 737 P.2d 154, 158[4] (Utah 1987); *Anderson*, § 3–415:16 at 351. A co-maker who claims that the signature was for accommodation bears the burden to prove that contention. *Ibid.* 3–415:12 at 349. Parol evidence is admissible to make that proof. *Wright v. Wright*, 567 S.W.2d at 374[1, 2].

■ The assessment of the intention to be bound only as a surety, and so as an accommodation party, is a question of fact to be determined from the language of the paper and from the amalgam of circumstances. *Id.* at 374–375; *White & Summers*, § 13–14 (1988). The two primary indicia of accommodation status are that the accommodation party receives no direct benefit from the proceeds of the instrument, and that the signature is needed by the maker to acquire the loan. *Ramsey v. First Nat'l Bank & Trust Co.*, 683 S.W.2d 947, 954[12] (Ky.App.1984); *McIntosh v. White*, 447 S.W.2d at 78[6–10].

■ The trial court found as a fact that Stacy Marshall signed the October 1, 1981, promissory note only for the purpose of lending her name to the paper as the wife of Brett Marshall "in order for Brett Marshall to purchase equipment for his farming business." On this premise, the court concluded that Stacy Marshall was an accommodation maker "both as to her husband and as to Richard Nickerson, Jeanne Nickerson, Don Marshall and Nancy Marshall." We determine that there was no basis in the substantial evidence to infer the fact that Stacy Marshall signed the paper to enable husband Brett to obtain credit. The weight of the evidence was to the contrary: that the signature of Stacy Marshall was altogether irrelevant to the willingness of the Bank to eventually agree to the loan to husband Brett.[4]

The evidence showed that at the time the note of October 1, 1981, was signed, Brett and Stacy Marshall, both eighteen years of age, had been recently married. Brett then did some farming and Stacy was recently employed at a wage of $6 per hour. Brett sought a loan for $80,000 from the Bank to purchase farm equipment from the Nickersons, for whom he did some work. The financial statement submitted to the Bank for the loan listed current assets of $28,268 [that included the $10,000 value of the mobile home, a vehicle and Stacy's wages], and a net worth of $20,068.

It was Nickerson, already a patron of the Bank, who broached the subject of a loan to Brett Marshall for the purchase of the equipment. The overture and negotiation episode was described by witness Hayes, president of the plaintiff Bank:

Q. Now, with respect to the reason for the loan, was it your understanding that it was to have Mr. Nickerson sell farm machinery and equipment to Brett Marshall?

A. That is my understanding of it, yes.

Q. Now, who approached you with that idea?

---

4. In the posture of this litigation, the burden to prove that Stacy Marshall signed the note as an accommodation maker rather than as a co-maker rested on the plaintiff Bank, the proponent of that assertion. The petition by the Bank on the note joined all six signatories, including Stacy Marshall, as defendants. They were sued as co-makers, as the pleadings, answers to interrogatories and admissions show. In the usual course, Stacy Marshall would have claimed the status of accommodation maker and contested the status of co-maker. The plaintiff Bank dismissed Stacy Marshall from the suit with prejudice, however, before the commencement of the trial, so that there was never occasion for that assertion of status by Stacy Marshall. At the trial, the plaintiff Bank re-ordered its strategy of evidence to the proof that Stacy Marshall was a co-accommodation maker, rather than a co-maker. The legal effect of such a contention, if proven, of course was to avoid release of a co-maker party against whom Don and Nancy Marshall, as accommodation makers, had a right of recourse under § 400.3–606, and hence the discharge of accommodation makers Don and Nancy Marshall.

A. Richard Nickerson.

Q. And at that time, Mr. Hayes, what, if any, response did you have with that request, if you remember?

A. Well, I—I do recall that Dick Nickerson approached me, would I be willing to finance Brett Marshall's purchase of the farm equipment and—for Brett and his bride, Stacy Marshall. And I indicated that I could not agree to that.

Q. And why did you indicate that you couldn't agree to that?

A. Because Brett Marshall did not have the underlying asset value nor the management experience nor the income necessary to retire the indebtedness and to support this level of indebtedness.

Q. In fact, you would, if you had loaned that money, been essentially loaning it to—to two young people just right out of high school. Fair statement?

A. I think the record reflects that, yes.

Q. With negligible assets?

A. Right. Uh-huh

Q. Now, did Mr. Nickerson thereafter suggest that you—that the bank loan the money and have Richard Nickerson and his wife and Brett join as the principals to this loan?

A. *After declining the request that I make the loan to Brett and Stacy*, Dick Nickerson returned offering that I would make the loan to the four of them—the four being Brett and Stacy Marshall, Richard and Jeannie Nickerson [emphasis added].

Q. And what, if any, response did you have with that offer?

A. I again declined the offer.

Q. And what, if any, reason did you have for declining that offer, sir, at that time?

A. *I did not feel that the credit strength of Richard and Jeannie Nixon—Nickerson substantiated the request beyond the level that Brett and Stacy offered* [emphasis added].

Q. Therefore, the joining of those two couples was not sufficient, in your opinion, to loan $80,000?

A. That is correct.

Q. Thereafter, did anyone approach you with the idea of having Don and Nancy Marshall join along with Brett and Stacy, Richard and Jeannie Nickerson?

A. Okay.

Q. And, if so, who approached you with that idea?

A. Okay. Subsequent to declining the request of Dick Nickerson for the four of them, he came back to me at a later date and asked would I make the loan if, in addition to the four of them, Brett's parents—

Q. Don and—

A. —Don and Nancy Marshall, joined in the making of the note.

Q. And with that particular offer, did the bank agree?

A. Yes, I did approve a loan on that basis.

It is palpable from this testimony that there was no intention by the Bank to treat Stacy Marshall as an accommodation maker. That is to say, her signature did not induce the credit that eventually issued as the loan. In fact, Hayes was emphatic that he "didn't care at all whether Brett and Stacy signed the note at all." [The evidence is conclusive that apart from her wages, she owned no money or property during the brief marriage.] The Bank was interested only in the signatures of the Nickersons and of the Marshall parents. The signatures *Brett Marshall* and *Stacy Marshall* superscribe the printed legend *signature of borrower* on the note of October 1, 1981. The other signatures—those of the Nickersons and of the Marshall parents—appear on the bottom and margin of the paper, without other legend. There is no evidence that conflicts with the testimony of banker Hayes or with the content of the promissory note. Thus, the finding of fact by the trial court that Stacy Marshall signed the paper in the capacity of accommodation maker is without support in the evidence. *McIntosh v. White*, 447 S.W.2d at 78[6–10].

That finding was without ground in the substantial evidence for the additional reason that Stacy Marshall received a direct benefit from the loan. It was her testimo-

ny that she considered herself a farmer's wife and, in addition to her own employment for wages, used the farm machinery to row-crop when needed, and tended the tobacco plants as well. She considered the farm operation a "joint venture" with husband Brett. The decision to purchase the farm equipment was a business matter about which they consulted. She signed the note and the security agreement, and the equipment was taken in their joint names. They maintained a joint checking account into which her wages and proceeds earned from the farming operation were placed. The joint debts and personal living expenses were paid from that source. When the funds from the farming enterprise were not sufficient to pay on the note, the balance came from the joint account.

The receipt of the proceeds from the instrument or other direct benefit is inconsistent with accommodation status of a signer. Thus, the burden rests on the party who claims the effect of an accommodation status to prove that the signatory did not directly benefit from the proceeds of the loan. *Commerce Union Bank v. Davis,* 581 S.W.2d 142, 144[1–3] (Tenn.App.1978); *White & Summers,* § 13–14, at 660. The pecuniary benefits Stacy Marshall derived from the loan are evident. She became a joint owner of the valuable machinery from the proceeds of the loan made to the spouses, and enhanced the productive activity of the farming enterprise that she shared with husband Brett. The profits were deposited to their account and used by them for personal ends as well as for business expenses. That the operation did not succeed does not transform the purpose of her signature from that of pecuniary gain to that of the loan of a name to enable credit for her husband. *Willis v. Willis,* 30 U.C.C. Rep. Serv. (Callaghan) 1332, 1342 (1981) (D.D.C.1980); *Feltman v. National Bank of Georgia,* 146 Ga.App. 434, 246 S.E.2d 447, 449[1–5] (1978).

Stacy Marshall signed the promissory note of October 1, 1981, as a co-maker with husband Brett, and not in an accommodation status.

## *The Release of Co–Maker Stacy Marshall and the Discharge of Accommodation Makers Don Marshall and Nancy Marshall*

■ It was the evidence that the original note of October 1, 1981, for $80,000 was signed by six parties: Brett and Stacy Marshall, Richard and Jeanne Nickerson, Don and Nancy Marshall. The note matured on August 1, 1982, still unpaid, and on that date was replaced by a renewal note prepared by the Bank for the same signatures, but executed by only five of them. Stacy Marshall was not a signatory. The paper of October 1, 1981, was then stamped PAID BY RENEWAL. A second renewal note was also executed by the five when the obligation matured still unpaid, and a third one as well. Stacy Marshall did not sign any of them, although a place for her signature was indicated on them.

It is the contention of accommodation makers Don and Nancy Marshall that the renewal of the original note by less than all the makers, without their consent, amounted to a release of a party to the instrument [Stacy Marshall] against whom—to the knowledge of the holder Bank—the accommodation makers on principles of suretyship had a right of recourse on the note, and so discharged them from obligation on the instrument by operation of § 400.3–606.

It is the theory of judgment that the cancellation of the original note and of each successive note on the date of maturity and the issuance and acceptance of the renewal promissory notes were the means intended by the parties to avoid default in the payment of the original and renewed obligations. That is to say, the parties consented to the discharge of not only Stacy Marshall on the obligation of October 1, 1981, but of all the other signatories as well—and that the consent to cancel and discharge was accorded by the five signatories to each successive, renewed promissory note. In this manner—according to the theory of judgment—the accommodation party signatories on the last successive promissory note executed in 1984 were all unconditionally bound as sureties to Brett Marshall on that instrument as a new obli-

gation despite the release of Stacy Marshall from the original note.

This theory of judgment—as to accommodation makers Don and Nancy Marshall—rests on the express findings of fact and law:

> Based upon the evidence taken as a whole and the credibility of the parties and witnesses that testified, the court finds that plaintiff's discharge of Stacy Marshall on the October 1, 1981, note was consented to by accommodation makers Don and Nancy Marshall and Richard and Jeanne Nickerson.

> That inasmuch as the parties *intended to cancel* promissory notes [under § 400.3–605] in exchange for the issuance and *acceptance of renewal promissory notes*, the promissory notes dated October 1, 1981, August 1, 1982, and August 1, 1983, were *cancelled;* the rights of plaintiff on each cancelled promissory note extinguished and correlatively, the defenses held by the persons who executed said *cancelled* promissory notes were also *cancelled* and extinguished [emphasis added].

> § 400.3–606(b) RSMo extends to accommodation parties suretyship defenses and because Don and Nancy Marshall's suretyship defense of release applied only to the October 1, 1981, promissory note, said defense was extinguished by the cancellation of said note and their consent to the release of Stacy Marshall thereon.

> Therefore, there was no impairment to Don and Nancy Marshall's right of recourse or contribution against Stacy Marshall on the August 1, 1984, note since she was not a party to said note. § 400.3–606(b) RSMo.

Cancellation and renewal, however, are disparate legal effects of disparate transactions. The findings and conclusions of the trial court confound them, and so misdirect the evidence into an erroneous judgment.

▮▮▮▮▮ Cancellation can only be made by the holder of the instrument.[5] It is a matter of intention, and not of consent—as the findings and judgment would have it. *Household Finance Co., Inc. v. Watson,* 522 S.W.2d 111, 116[9–11] (Mo.App.1975); 6 R. Anderson, Uniform Commercial Code § 3–605:5 (3d ed. 1984). A cancellation of a signature is accomplished by the destruction, mutilation or striking of that signature to the note, and results in the discharge of that party from obligation on the instrument. *Gullette v. Federal Deposit Ins. Corp.,* 231 Va. 486, 344 S.E.2d 920, 923[3] (1986: *Rubbelke v. Strecker,* 53 Wash.App. 20, 765 P.2d 314, 315[1] (1988.) A cancellation of the note is accomplished by the surrender of the instrument or the renunciation of rights by the holder by a separate writing signed and delivered, and results in the discharge of all of the obligor signatories on the instrument. § 400.3–605(1)(b); *Schaefer Livestock Hauling Inc. v. Gretna State Bank,* 229 Neb. 580, 428 N.W.2d 185, 191 (1988). The methods for cancellation described in § 400.3–605 are exclusive. *Gullette v. Federal Deposit Ins. Corp.,* 344 S.E.2d at 923[3]; § 400.3–605 comment 1.

▮▮▮ Renewal is also a matter of intention—but of intention of all the signatories to consent to the renewal of the instrument. *First Nat'l Bank in Marlington v. Blackhurst,* 345 S.E.2d 567, 573 (W.Va. 1986). Whereas cancellation of a note discharges the obligation, renewal—unless itself a novation—merely postpones the repayment of the loan. *Zelinger v. Columbia Sav. & Loan Ass'n,* 768 P.2d 744, 745[2] (Colo.App.1988); *Commerce Union Bank v. Burger-In-A-Pouch, Inc.,* 657

---

**5.** Section 400.3–605 *Cancellation and renunciation* provides:

> (1) The holder of an instrument may even without consideration discharge any party
> (a) in any manner apparent on the face of the instrument or the endorsement, as by intentionally cancelling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or

> (b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.
> (2) Neither cancellation nor renunciation without surrender of the instrument affects the title thereto.

S.W.2d 88, 90[1] (Tenn.1983). To have effect, moreover, renewal does not entail, as does cancellation, the surrender of the outstanding note. *Estate of Williams v. Illinois Trust & Sav. Bank,* 109 Ill.App.3d 828, 65 Ill.Dec. 499, 504, 441 N.E.2d 412, 417 (1982).

■ The evidence on these cognate issues is sparse, and as to the role of the Bank throughout this episode, even slighter.

The intention of the holder Bank to cancel the original note of October 1, 1981 [a premise that undergirds the adjudication]—does not appear either by conduct or circumstance. The holder Bank neither struck any of the signatures from the instrument nor surrendered the paper, so that overt manifestation of intention to cancel lacked. Hayes was the Bank officer who directed the preparation of that instrument and was in charge of the transaction. Hayes left the Bank in August of 1982—the very time of the first "renewal" note. He testified he had no knowledge of any of the circumstances of any transaction after the first note. The other Bank witness was vice-president Rice. He came to the Bank in 1983, after the original note and the first "renewal" note of August 1, 1982, were transacted. He supervised the 1983 and 1984 "renewal" episodes. Rice testified to the "understanding" between him and "the named persons whose signatures appear thereon with respect to the prior promissory note before that." His "understanding" was that the August 1, 1982, note was "cancelled by the signing and issuance and acceptance" of the August 1, 1983, note. It was his "understanding," again, that the August 1, 1984, note "cancelled out" the August 1, 1983, note. Cancellation, however, depends for efficacy on the intention of the holder only. § 400.3–605(1); *Household Finance,* 522 S.W.2d at 116[9–11]; *Rubbelke v. Strecker,* 765 P.2d at 315[1] In any event, there was no explanation how his "understanding" was derived—nor when, nor the occasion, nor with whom. There was no explanation, moreover, how an "understanding" come to no earlier than in 1983, when Rice assumed duty at the Bank, could affect past relationships and transactions with the principals.

The premise of adjudication that the note of October 1, 1981, was cancelled—so that not only Stacy Marshall was discharged, but also all of the accommodation maker signatories—may not be inferred from the proven circumstances.

Nor does the evidence allow the inference essential to the related ground of judgment: that the note of August 1, 1982, and each successive note was a renewal of the antecedent obligation. Renewal depends upon the consent of *all* the signatories that the act shall have that effect. *Commerce Union Bank v. Burger–In–A–Pouch,* 657 S.W.2d at 90[1]; *First Nat'l Bank in Marlington v. Blackhurst,* 345 S.E.2d at 573. Stacy Marshall, a signatory on the original note of October 1, 1981, did not execute the "renewal" note of August 1, 1982, nor any of the successive instruments. There is no proof from any source that the Marshall parents or the Nickersons consented to forgo their right of recourse against Stacy Marshall on the original obligation or to her release as a party to any instrument to postpone payment.

There is no doubt that the original note was signed at the Bank by all of the six parties. The signatories, other than Stacy Marshall, testified that the second note was also signed at the Bank. Hayes, the Bank official who conducted the original transaction, professed no knowledge of the first "renewal" transaction August 1, 1982. Thus, the evidence leaves a lacuna event critical to the proof of both the cancellation and renewal theories of the judgment. Hayes could give no explanation to why, although the place for the Stacy Marshall signature was reserved on that "renewal" note, it was never obtained. Nor does the Hayes evidence even intimate that the Marshall parents were informed that Stacy Marshall was not an expected signatory on the "renewal" note of August 1, 1982, or that the effect of the successive note [as the Bank also claims] was to cancel the

obligation of August 1, 1981, and to discharge the signers—and that the Marshall parents nevertheless acceded.

Stacy Marshall testified that after she signed the original note she never heard from the Bank again. No one spoke with her to sign the renewal notes of 1982, 1983 or 1984. The defendants Don and Nancy Marshall—as did Brett Marshall—all testified that they never knew that Stacy Marshall was not a signatory to the successive August 1, 1982, and other "renewal" notes. Nor did the Bank solicit their consent to the discharge of Stacy Marshall on any instrument, nor was consent accorded. It was the testimony of the Marshall parents that all the notes were signed at the Bank, the original instrument and successive notes. Since Stacy signed the original note after work when the others had already subscribed and left, the Marshall parents assumed that she would attend to her signature on the "renewal" notes in the same way, and they had no reason to believe that her signature would not appear at the place reserved. It was not until suit was filed that they knew the successive instruments lacked her signature.

The other Bank witness, vice-president Rice, knew nothing of the August 1, 1982, note—the first "renewal". He supervised the 1983 and 1984 transactions. Contrary to the testimony of Brett Marshall and the parents that they executed those notes at the Bank, Rice testified the notes were confided to Brett to obtain the signatures. He could give no other explanation of the legend *Stacy Marshall* on each of those notes than that "the form of the prior note was used to make up the new one."

We conclude that the evidence sustains neither the finding of cancellation nor of renewal, so that the judgment erroneously applies the law, and must be reversed. *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

We are bound nevertheless to uphold the judgment rendered in a case tried to the court, if correct, even though the reasons ascribed are wrong or insufficient.

*Rietsch v. T.W.H. Co., Inc.*, 702 S.W.2d 108, 117[14–15] (Mo.App.1985).

The two premises of the judgment as rendered are not only without support in the evidence, but also incompatible as legal theories. Cancellation involves the extinguishment of the original obligation on the note by the surrender of the instrument, or other such means. Renewal involves the suspension or postponement of the original obligation. Novation accommodates both cancellation and renewal by the extinguishment of the old obligation and substitution of a new obligation instead. *Federal Land Bank of Louisville v. Taggart*, 31 Ohio St.3d 8, 508 N.E.2d 152, 157–158[15, 16] (S.Ct. 1987); *Nolin Prod. Credit Ass'n v. Citizens Nat'l Bank*, 709 S.W.2d 466, 467[1, 2] (Ky.App.1986). In order to constitute a discharge of obligation by novation, the transaction must meet the requirements of an ordinary novation under contract law. § 400.3–601(2); Annotation, Renewal Note Signed by One Comaker As Discharge of Nonsigning Comakers, 43 ALR3d 246, 252 (1972). That is to say, there must be mutual agreement among the creditor and the debtors that intends to extinguish the old obligation and substitute the new. *Wilson v. Midstate Indus., Inc.*, 777 S.W.2d 310, 312[1, 2] (Mo. App.1989). The new obligation may be among less than all, and even different, obligors than the old. *Id.* at [1]; Restatement (Second) of Contracts § 280 (1979). The evidence lacks to sustain the judgment even on this theory the findings seem to suggest. There was no proof of mutual agreement between the creditor Bank and the debtor signatories to release Stacy Marshall from obligation on the original promissory note and to accept in lieu the new obligation of the other five—Brett Marshall, the Marshall parents and the Nickersons.

We sustain the contention of the Marshall parents that the release by the holder Bank of Stacy Marshall from the October 1, 1981, note, a person against whom the accommodation makers Marshall had a right of recourse for subrogation, discharged them altogether from liability on

the instrument to the Bank.[6] The release of co-maker Stacy Marshall from the instrument by the holder Bank impaired the right of accommodation makers Marshall to subrogation against that primary obligor and so increased their risk as sureties. That suffices to vitiate the suretyship contract and to discharge them from obligation on the note. *Citizens Bank of Smithville v. Lair,* 687 S.W.2d 268, 270[2] (Mo.App. 1985)[7]; *White & Summers,* § 13–13 at 656.

The judgment is reversed.

All Concur.

---

**6.** § 400.3–606, Impairment of recourse or of collateral

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

(a) without express reservation of rights releases or agrees not to sue any person against

whom the party has to the knowledge of the holder a right of recourse ...

**7.** *Citizens Bank* involves a guarantor rather than an accommodation party. In terms of the Uniform Commercial Code, *surety* includes guarantor. § 400.1–201(40).